**LINZER PRODUCTS CORPORATION,**
**Plaintiff,**

v.

**Chandra SEKAR, Defendant.**

**No. 06 Civ. 13218(SAS).**

United States District Court,
S.D. New York.

July 23, 2007.

Keith A. Walter, Esq., Ratner Prestia P.C., Wilmington, DE, Donald L. Rhoads, Esq., Vito J. DeBari, Esq., Kramer Levin Naftalis & Frankel LLP, New York, NY, for Plaintiff Linzer Products Corporation.

Adam B. Landa, Esq., Rachel L. Izower, Esq., Greenberg Traurig LLP, New York, NY, for Defendant Chandra Sekar.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Chandra Sekar ("Sekar") invented an inexpensive industrial process for manufacturing plastic paint rollers. In 1996, Sekar was awarded a patent (the "'790 Patent") for this invention, giving him the right to exclude others from using his process (the "'790 process") to manufacture paint rollers.[1] In 1998, Sekar entered into a license agreement (the "Agreement" or "1998 Agreement") with Linzer Products Corporation ("Linzer"), a manufacturer of paint rollers, permitting Linzer to use his '790 process in exchange for royalties.[2] Shortly thereafter, Linzer began using the '790 process to manufacture one-ply paint rollers, paying royalties to Sekar for each roller.

In 2000, Sekar was awarded a second patent (the "'134 Patent") for another invention, a process for manufacturing plastic paint rollers having two or more layers (the "'134 process").[3] With Sekar's knowledge and assistance, Linzer began manufacturing *two-ply* paint rollers (in addition to its one-ply roller production). Accordingly, Linzer also began paying royalties for its two-ply roller production at the same rate it had paid for its one-ply rollers.

The parties operated amicably on these terms until 2006, when they began to disagree about the amount of royalties owed. Linzer claimed that it had no obligation to pay *any* royalties for its use of the two-ply process because this process was not covered by the '790 Patent. As explained below, the relationship deteriorated, and Sekar eventually threatened to sue Linzer if Linzer refused to negotiate new royalty terms for its use of the two-ply process.

Instead of waiting for Sekar to sue, Linzer filed this lawsuit, bringing a number of state and federal claims against Sekar,

---

1. *See* U.S. Patent No. 5,572,790; 35 U.S.C. § 271(a) ("whoever without authority makes, uses, offers to sell, or sells any patented invention ... during the term of the patent therefor, infringes the patent").

2. *See* License Agreement between Sekar and Linzer, dated April 25, 1998, Ex. C to First Amended Complaint, dated December 14, 2006 ("Compl.").

3. *See* U.S. Patent No. 6,159,134.

including: (1) breach of the covenant of good faith and fair dealing; (2) breach of warranty; (3) breach of contract; (4) unjust enrichment; and (5) various antitrust violations under both federal and state law. Linzer also asks the Court for several declaratory judgments relating to (1) the parties' rights with respect to the Agreement; (2) the alleged unenforceability of certain provisions of the Agreement in light of principles of patent law and federal and state antitrust law; and (3) the alleged invalidity of the patents-in-suit.

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), Sekar moves to dismiss most, but not all, of these claims.[4] For the following reasons, Sekar's motion to dismiss is granted in part and denied in part.

## II. BACKGROUND

### A. Sekar Invents the '790 Process

Linzer is a New York corporation in the business of manufacturing paint applica-

tion products, including paint rollers. Sekar is an individual residing in New York. Sekar invented a process for manufacturing paint rollers from a thermoplastic called polypropylene and received the '790 Patent for that process in 1996. Sekar is a joint owner of the '790 Patent with Newell Operating Company ("Newell").[5] Newell manufactures plastic products and competes with Linzer in the paint-roller market.[6]

### B. Linzer and Sekar Execute the 1998 Licensing Agreement

In April 1998, Linzer and Sekar executed the Agreement, granting Linzer a royalty-bearing license to use the '790 Patent to manufacture "Licensed Products."[7] It also grants Linzer *royalty-free* licenses to use Sekar's related knowledge and trade secrets,[8] and any of Sekar's future inventions relating to polypropylene paint roller

---

4. *See* Memorandum of Law in Support of Defendant Chandra Sekar's Motion to Dismiss ("Def. Mem.") at 2. Sekar does not move to dismiss Linzer's claims for breach of contract or unjust enrichment. Nor does he move to dismiss Linzer's requests (1) for a declaratory judgment that Sekar is estopped from terminating the Agreement or (2) for a declaratory judgment that part of the Agreement is an unenforceable unlawful restrictive covenant under New York law.

5. *See* Agreement at 1 ("Sekar is the owner of an undivided one-half interest in and to United States Patent No. 5,572,790 relating to methods for the manufacture of paint rollers"). *See also* Reply Memorandum of Law in Further Support of Defendant Chandra Sekar's Motion to Dismiss ("Def. Rep.") at 12; 5/2/07 Letter from Keith A. Walter, counsel for Linzer, to the Court ("5/2/07 Walter Letter"), at 1.

6. *See* Def. Rep. at 12.

7. *See* Agreement § 2.1 ("During the Term of this Agreement ... Sekar hereby grants to

Linzer, under the Patent Rights, a royalty-bearing, non-exclusive right and license to make, use, and/or sell Licensed Products in the Territory."). For purposes of this dispute, the Agreement defines "Licensed Products" as "length[s] of Polypropylene Paint Roller ... manufactured using a process or apparatus claimed in" "a claim of the Patent Rights which has not been withdrawn, canceled, disclaimed, abandoned, or held invalid, unpatentable, or unenforceable by a tribunal of competent jurisdiction...." *Id.* §§ 1.4–1.7. "Patent Rights means Sekar's joint interest in and to United States Letters Patent No. 5,572,790...." *Id.* § 1.2. The Agreement also sets out a quarterly schedule by which Linzer must pay royalties to Sekar based on the number of Licensed Products manufactured by Linzer. *See id.* §§ 3.2–3.3.

8. *See id.* § 6.2 ("Sekar grants and agrees to grant to Linzer a royalty free, fully paid up, perpetual right and license to use the Sekar Know-how in connection with the manufacture of Polypropylene Paint Rollers.").

manufacturing.[9] The Agreement also included a sale of two machines for manufacturing paint rollers to be delivered and installed by Sekar at Linzer's facilities.[10] In addition, each party made express warranties to the other. Sekar warranted that "[a]s of the Agreement Date ... he [was] not aware of anything that would effect [sic] the validity of the Patent Rights...." [11] Linzer warranted "that during the Term of this Agreement it shall not manufacture or sell any Polypropylene Paint Roller unless it is a Licensed Product." [12] Finally, the Agreement provides that certain rights and obligations will survive termination of the Agreement, including Linzer's royalty-free licenses to Sekar's knowledge, trade secrets, and future inventions.[13]

Pursuant to the Agreement, Sekar delivered and installed two machines at Linzer facilities, which Linzer used to manufacture one-ply rollers. The process that these machines employed (the "Linzer one-ply process") was similar, though not identical, to Sekar's '790 process.

## C. Sekar Invents the Multi–Ply '134 Process

Sekar later invented another process for manufacturing paint rollers, for which he received the '134 Patent in December 2000.[14] This process is used to produce multi-layer or multi-ply paint rollers. In 2002, with Sekar's assistance, Linzer implemented a two-ply roller production process (covered by the '134 Patent) and began producing two-ply rollers.[15] Linzer paid royalties for its two-ply roller production at the same royalty rate that the Agreement set for Linzer's use of the one-ply process.[16]

## D. Linzer and Sekar Dispute Their Obligations Under the Agreement

Linzer and Sekar performed the Agreement to the satisfaction of both parties until February 2006, when Sekar began an audit of Linzer's royalty payments.[17] Responding to the audit, Linzer instituted its own review of the terms of the Agreement to verify which of Linzer's processes were covered by the '790 and '134 Patents. After this review, Linzer took the position that its royalty payments for its two-ply process had been paid mistakenly. Linzer's position was—and is—that its two-ply process was within the scope of the '134 Patent (which it had a *royalty-free* license to use), and not within the scope of the '790 Patent (which it had a *royalty-bearing*

9. *See id.* § 8.1 ("In the event that Sekar invents an invention related to the Technology ... Sekar hereby grants and agrees to grant to Linzer during the Term of this Agreement a fully paid-up, royalty-free right and license to practice the invention throughout the world.").

10. *See id.* § 11.1 (Sekar to deliver and install two machines at Linzer's facilities; Linzer to pay $75,000 for each machine upon delivery and before installation).

11. *Id.* § 14.1.

12. *Id.* § 14.4.

13. "Upon the expiration of the Term of this Agreement, or earlier termination as permitted herein, all rights and obligations hereunder shall terminate, except for such rights and/or obligations in *Sections 6.2, 6.4, 7.3, 8.1, 8.2, 9.2, 9.3, 9.4, 9.5, 10.5* and this Section 16, which rights and/or obligations shall survive termination of this Agreement." *Id.* § 16.2 (underline in original).

14. Unlike the '790 Patent, which is jointly owned by Newell and Sekar, the '134 Patent is owned solely by Sekar. *See* Compl. at ¶ 258.

15. *See id.* at ¶¶ 49–51, 253.

16. *See id.* at ¶ 59.

17. *See id.* at ¶¶ 54, 56.

license to use). Sekar disagreed, responding that Linzer's two-ply process was covered by both the '134 *and* '790 Patents, and therefore royalties were owed.[18] The parties began a series of discussions to resolve their differences. At the same time, Linzer obtained an opinion of counsel that the '790 Patent was invalid and another opinion that Linzer's two-ply process did not infringe the '790 Patent. Linzer provided these opinions of counsel to Sekar in August and September 2006 under a written agreement pursuant to Rule 408 of the Federal Rules of Evidence regarding inadmissibility of communications made in settlement negotiations.[19]

Sekar responded to these opinions in a letter to Linzer's general counsel. As to the invalidity opinion, Sekar responded that he "is not persuaded that there is any serious likelihood that the '790 Patent would be held to be invalidated in the event of a challenge."[20] Regarding non-infringement, Sekar noted that if Linzer's opinion was correct (*i.e.*, Linzer's two-ply process was outside the scope of the '790 Patent) then Linzer was in breach of its warranty that it would not manufacture paint rollers other than Licensed Products (*i.e.*, rollers made by the process of the '790 Patent).[21] Sekar also cautioned that while Linzer's prior breach of its warranty may have been inadvertent, Linzer was now on notice, therefore any continued use of its two-ply process would be willful.[22]

Sekar also gave a 40–day notice of termination pursuant to the termination provisions of the Agreement, stating that the notice was "a mere formality since Linzer's breach of warranty is non-curable[,]" implying that such notice was unnecessary, and adding that "[n]evertheless, at present, Mr. Sekar does no[t] intend to terminate the agreement before expiration of the 40–day notice period."[23] Sekar suggested terms under which Linzer would pay breach damages and proposed that the parties renegotiate the Agreement to include explicit terms licensing Linzer's two-ply roller production under the '134 Patent (at a much higher royalty rate than Linzer had been paying). In a November 2006 letter, Sekar also stated that he would be "happy to meet with Linzer to discuss renegotiation of the License Agreement[,]" but that Sekar "want[s] it to be clear that if we [Linzer and Sekar] cannot reach agreement, Mr. Sekar intends to let a Court decide the legal issues."[24]

## E. Linzer's Lawsuit

Linzer chose not to wait for Sekar to sue for breach and/or patent infringement. Linzer sued in November 2006, and filed its Amended Complaint in December. The Amended Complaint contains eighteen claims, fourteen of which Sekar now moves to dismiss. Many of the claims in Linzer's Amended Complaint seek a declaratory judgment of the parties' rights under their

---

**18.** *See* Compl. at ¶ 64; 6/5/06 Letter from Frederick H. Mandel, counsel for Sekar, to Alden Myers, general counsel for Linzer ("6/5/06 Mandel Letter"), Ex. F to Compl., at 2 ("paint rollers produced using the ['134] process fall within the scope of the ['790] patent claims as well").

**19.** *See* Compl. at ¶¶ 67–68.

**20.** 9/14/06 Letter from Mandel to Myers ("9/14/06 Mandel Letter"), Ex. E to Compl., at 1.

**21.** *See id.* at 2 (referring to Linzer's warranty at section 14.4 of the Agreement).

**22.** *See id.* at 3.

**23.** *Id.* Sekar has since issued additional notices of termination under various provisions of the Agreement.

**24.** 11/2/06 Letter from Mandel to Myers ("11/2/06 Mandel Letter"), Ex. O to Compl., at 1–2.

License Agreement, a common feature of suits brought against patent holders and their licensees.[25]

The claims in the Amended Complaint are arranged, with no apparent organizing principle, into Counts numbered I through XIII (including Counts VII(A)-(F)). Each of the parties' briefs adds to this confusion by addressing the claims in a seemingly random order that corresponds neither to the Amended Complaint nor to the preceding briefs. To make sense of the issues raised by the briefs, this Opinion will group the claims as follows: (1) claims that arise under contract law, (2) claims that seek a declaratory judgment of the parties' rights under the 1998 Agreement (including some such claims that are based on antitrust law), and (3) claims that arise under patent law.

## III. LEGAL STANDARDS

### A. Rule 12(b)(1) Motion to Dismiss

Rule 12(b)(1) provides for the dismissal of a claim when the federal court "lack[s] ... jurisdiction over the subject matter." Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.[26]

In considering a motion to dismiss for lack of subject matter jurisdiction, the court must assume the truth of the material factual allegations contained in a complaint.[27] However, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." [28] In fact, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." [29]

### B. Rule 12(b)(6) Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires ... 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " [30] When a complaint is attacked by a Rule 12(b)(6) motion to dismiss, the plaintiff need not provide "detailed factual allegations." [31] When decid-

**25.** *See MedImmune, Inc. v. Genentech, Inc.,* —— U.S. ——, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). In the context of a patent license dispute, declaratory judgment claims serve to relieve a licensee from the threat of an infringement suit and the injunction or damages that might result. In such suits, the declaratory judgment plaintiff often takes legal positions similar to those adopted by patent infringement defendants. For example, a licensee who is sued as a patent infringement defendant might raise the defense that the patent is invalid. If that same licensee had sufficient reason to believe such a suit would be filed, the licensee might file a declaratory judgment suit as a plaintiff, raising the same substantive argument—the patent's invalidity—in the form of a declaratory judgment that the patent is invalid.

**26.** *See Luckett v. Bure,* 290 F.3d 493, 496–97 (2d Cir.2002). *See also Goonewardena v. New York,* 475 F.Supp.2d 310, 321 (S.D.N.Y.2007) ("[T]he burden of demonstrating that the court has subject matter jurisdiction over the case falls on the plaintiff as it is the plaintiff who seeks to invoke the court's jurisdiction.").

**27.** *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (citing *J.S. ex rel N.S. v. Attica Cent. Schs.,* 386 F.3d 107, 110 (2d Cir.2004)).

**28.** *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998) (citing *Norton v. Larney,* 266 U.S. 511, 515, 45 S.Ct. 145, 69 L.Ed. 413 (1925)).

**29.** *LeBlanc v. Cleveland,* 198 F.3d 353, 356 (2d Cir.1999).

**30.** *Erickson v. Pardus,* —— U.S. ——, ——, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting Fed.R.Civ.P. 8(a)(2)).

**31.** *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, ——, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007).

ing a defendant's motion to dismiss under Rule 12(b)(6), a judge must "accept as true all of the factual allegations contained in the complaint" [32] and "draw all reasonable inferences in plaintiff's favor." [33]

Nevertheless, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." [34] A complaint must "amplify a claim with some factual allegations ... to render the claim *plausible* [italics in original]." [35] In other words, it must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" [36] Moreover, although the court must take the plaintiff's allegations as true, "the claim may still fail as a matter of law ... if the claim is not legally feasible." [37]

## IV. DISCUSSION

### A. Contract Claims (Counts I, II, VIII)

#### 1. Linzer's Allegations State a Claim for Breach of the Covenant of Good Faith and Fair Dealing (Count I)

██ In Count I, Linzer alleges a breach of the covenant of good faith and fair dealing and seeks an injunction prohibiting Sekar from, *inter alia*, terminating the 1998 Agreement.[38] Sekar argues that Count I should be dismissed because Linzer failed to allege that Sekar has threatened termination, and should also be dismissed because Linzer has failed to allege that Sekar acted in bad faith.

Linzer has sufficiently alleged that Sekar threatened to terminate the Agreement. Sekar issued a notice to Linzer under section 10.2.2, a termination provision of the Agreement, noting that Sekar "does no[t] intend to terminate the agreement before expiration of the 40–day notice period [of section 10.2.2]." [39] Also, in response to legal actions taken by Linzer, Sekar has agreed to forbear from exercising "any right he may have" to terminate the Agreement.[40] Under Sekar's interpretation of the Agreement, he does have a termination right, triggered by Linzer's failure to pay royalties owed and/or its material breach of section 14.4. And Sekar's words suggest he would exercise this right—in accordance with the termination provisions of the Agreement—if he found Linzer's conduct to be deficient. Moreover, in his Memorandum of Law in Opposition, Sekar argues that he has not threatened to terminate the Agreement, but he does not promise to *abstain* from termi-

---

**32.** *Id.* at 1975 (citation omitted).

**33.** *Ofori–Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir.2006).

**34.** *See Bell Atlantic*, 127 S.Ct. at 1970.

**35.** *Iqbal v. Hasty*, No. 05 Civ. 5867, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after 9/11).

**36.** *ATSI Commc'ns v. Shaar Fund, Ltd.*, No. 05 Civ. 5132, 2007 WL 1989336, at *5 (2d Cir. July 11, 2007) (quoting *Bell Atlantic*, 127 S.Ct. at 1965).

**37.** *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 457 F.Supp.2d 455, 459 (S.D.N.Y. 2006) (citing *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir.2006)).

**38.** *See id.* at ¶ 101.

**39.** 9/14/06 Mandel Letter at 3. *See also* Compl. at ¶ 72. Sections 10.2.1 and 10.2.2 respectively give Sekar a right to terminate if Linzer fails to pay monies owed or otherwise materially breaches the Agreement.

**40.** *See* Compl. at ¶¶ 80, 100.

nating the Agreement nor does he state that he is *unable* to terminate.

Linzer also sufficiently alleges that Sekar's threats of termination were made in bad faith. Taking Linzer's allegations as true, Sekar used Linzer's opinions of counsel to threaten termination of the Agreement, though the opinions were tendered pursuant to an agreement that they would be used only for settlement purposes.[41] Sekar allegedly threatened termination in the absence of a material breach, and did so with the intent to force Linzer to agree to higher royalty rates on its two-ply process.[42]

In further support of its claims of bad faith, Linzer notes that Sekar assisted Linzer in implementing the two-ply process that Sekar now identifies as his grounds for termination. Linzer employees visited Sekar's facility to learn how to implement the two-ply process. Linzer alleges that without Sekar's help, Linzer would have been unable to implement that process. Linzer also alleges that Sekar has known the details of Linzer's manufacturing processes at all relevant times, and has personally observed them in action at Linzer's New York facility.[43] If, as Linzer alleges (and Sekar denies), Sekar accepted royalties for Linzer's two-ply production, *knowing* that such royalties were not owed, such conduct would support a claim of bad faith.

Count I adequately pleads both threats of termination and bad faith on Sekar's part. Accordingly, Sekar's motion to dismiss Count I is denied.

### 2. Linzer's Allegations State a Claim for Breach of Warranty (Count II)

In Count II, Linzer alleges that Sekar breached his warranty to Linzer that he was "not aware of anything that would [affect] the validity of the Patent Rights" because Sekar knew his invention to be inoperable as described in the application that eventually became the '790 Patent.[44] Sekar argues that Count II should be dismissed because "the only way [Linzer] can succeed on Count II is to succeed on Count XI (which [Linzer] cannot)."[45] Count XI alleges that the '790 Patent is invalid. In order to prevail on its breach of warranty claim, Linzer must show that Sekar withheld information that affected the validity of the '790 Patent. Sekar argues that because Linzer lacks standing to challenge the validity of the '790 Patent, it cannot make the necessary showing to

---

**41.** When Linzer asserted that no royalties were owing for its two-ply process, Sekar requested an explanation of the theories underlying Linzer's position. *See id.* at ¶¶ 64–65. In response, Linzer provided Sekar with two opinions of Linzer's counsel, subject to an agreement between the parties that the opinions would be used for settlement purposes only. *See id.* at ¶¶ 66–68. Taking Linzer's allegations as true, Sekar relied on these opinions of counsel in bad faith, not for settlement purposes, but to assert that Linzer was in breach of the Agreement. *See id.* at ¶¶ 69–72; 9/14/06 Mandel Letter at 2–3; 9/25/06 Letter from Mandel to Linzer, Ex. I to Compl., at 2 ("Based upon advice received by you from you[r] attorneys, and based upon your acceptance and adoption of that advice, you [are] now on notice that you have been in

material breach of the License Agreement from the time you began manufacturing two-ply rollers. Moreover, you have continued to breach the warranty knowingly and willfully from at least the time you first received legal advice to the effect that the two-ply rollers are not Licensed Products.").

**42.** *See* Compl. at ¶¶ 71, 96.

**43.** *See id.* at ¶¶ 51–52, 253.

**44.** Agreement § 14.1. For present purposes, the Agreement defines "Patent Rights" as Sekar's interest in the '790 Patent. *See id.* § 1.2.

**45.** Def. Mem. at 24 (emphases omitted).

succeed on its breach of warranty claim, *i.e.*, that the information Sekar allegedly withheld indeed affected the '790 Patent's validity. Sekar's argument fails because Linzer has standing to challenge the validity of the patents-in-suit,[46] and will thus have the opportunity to prove up its breach of warranty claim. Sekar's motion to dismiss Count II is denied.

### 3. Linzer's Allegations Do Not State a Claim for Reformation (Count VIII)

■■■ Sekar argues that Count VIII, in which Linzer seeks reformation of the 1998 Agreement, fails to state a claim because Linzer fails to allege a mistake, fraud, and that the Agreement does not reflect the parties' intent. "[R]eformation of a contract should be allowed only where mutual mistake or fraud is clearly established, particularly when the negotiations were conducted by sophisticated, counseled business people."[47]

> [T]he complaint in a suit for the reformation of a written instrument must set forth (1) an agreement other than that expressed in the instrument; (2) the written instrument sought to be reformed; and (3) mutual mistake of the parties, or the mistake of one party and the fraud of the other.[48]

To prevail on a claim for reformation, "a petitioning party has to show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties."[49]

Linzer alleges that "Sekar lead [sic] Linzer to believe that (i) it had the right to practice the two-ply process under the agreement, and (ii) Linzer was required to pay Mr. Sekar royalties for the two-ply process," when Sekar knew "that Linzer was not required to pay royalties for the two-ply process and Linzer is purportedly not permitted to practice the two-ply process under Mr. Sekar's construction of § 8.1 of the 1998 Agreement."[50] Sekar's allegedly fraudulent conduct might suffice to establish bad faith in the *performance* of the Agreement, but it cannot support a reformation claim because the conduct happened well after the Agreement was executed. The alleged conduct regarding the two-ply process occurred after 2000, and could not have affected Linzer's understanding of the terms of the Agreement at the time of execution in 1998. Thus, Linzer fails to sufficiently allege unilateral mistake and fraud. "A bare claim of unilateral mistake by the *plaintiff*, unsupported by legally sufficient allegations of fraud on the part of *defendants*, does not state a cause of action for reformation."[51]

Moreover, even assuming that Linzer had sufficiently alleged unilateral mistake and fraud, its reformation claim would still fail because Linzer does not allege what the parties' true agreement was. Accordingly, Linzer fails to state a claim for

---

46. *See infra* Part IV.C.

47. *Briand Parenteau Assocs. Inc. v. HMC Assocs.*, 225 A.D.2d 874, 638 N.Y.S.2d 817, 819 (3d Dep't 1996) (citing *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573–74, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986); *Seebold v. Halmar Constr. Corp.*, 146 A.D.2d 886, 536 N.Y.S.2d 871 (3d Dep't 1989)).

48. 16 N.Y. Jur.2d *Cancellation of Instruments* § 86 (2007) (citations omitted).

49. *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc.*, 46 N.Y.2d 211, 217, 413 N.Y.S.2d 135, 385 N.E.2d 1062(1978).

50. Compl. at ¶ 232.

51. 16 N.Y. Jur.2d *Cancellation of Instruments* § 86 (2007) (citations omitted) (emphasis added).

reformation and Sekar's motion to dismiss Count VIII is granted.

### B. Claims Seeking a Declaratory Judgment of the Parties' Rights Under the 1998 Agreement (Counts IV, V, VII(A)-(E), X, XIII)

#### 1. The Parties' Dispute Over the License of the '134 Patent Is Ripe for Adjudication (Count IV)

■ In Count IV, Linzer seeks a declaratory judgment that the 1998 Agreement grants Linzer a royalty-free license to practice the methods of the '134 Patent and that this license survives the termination of the 1998 Agreement.[52] Sekar argues that Count IV should be dismissed as unripe because Sekar has neither threatened to terminate the Agreement nor to bring an infringement suit.[53] Absent such a threat, Sekar reasons, Count IV requests an impermissible advisory opinion.[54]

Sekar's argument is without merit. Count IV seeks a remedy for an actual conflict which poses a threat of imminent harm to Linzer. As discussed above, the Amended Complaint does allege that Sekar has threatened to terminate the Agreement.[55] Moreover, the parties have been involved in this contract dispute for more than a year. The judgment sought in Count IV would relieve Linzer of its ongoing royalty payments to Sekar for its two-ply process, royalties Linzer asserts were never owed and have been mistakenly paid for years. The judgment sought in Count IV would also determine whether, under the terms of the 1998 Agreement, Linzer's license to the '134 Patent survives termination of that Agreement. If it does not, Linzer will have to develop an alternate method for producing two-ply rollers, negotiate a new license with Sekar, or abandon the market for two-ply rollers. Despite Sekar's arguments to the contrary, these are not theoretical harms, but rather the realities of a business in which Linzer has a great deal at stake. Thus, Sekar's motion to dismiss Count IV is denied.

#### 2. Linzer's Request for a Declaratory Judgment that Its Two–Ply Process Is Not Covered by the '790 Patent Is Not Futile (Count V)

■ In Count V, Linzer seeks a declaratory judgment that its two-ply process is not covered by the '790 Patent.[56] If this is so, then two-ply rollers manufactured by that process are not Licensed Products under the 1998 Agreement[57] and Linzer does not owe Sekar royalties for the manufacture of these rollers.[58]

Sekar argues, however, that if it is determined that Linzer's two-ply process is not covered by the '790 Patent, then it necessarily follows that Linzer is in breach of section 14.4 of the Agreement.[59] Thus,

---

52. *See* Compl. at ¶ 134.

53. *See* Def. Mem. at 33.

54. *See id.* at 35.

55. *See supra* Part IVA.1.

56. Compl. at ¶ 149 (seeking "a declaratory judgment . . . that [Linzer] owes no royalties to Mr. Sekar under the 1998 Agreement based on roller covers made in accordance with [Linzer's] two-ply process . . . and that [Linzer's] two-ply process does not fall within the claims of the '790 Patent.").

57. *See* Agreement §§ 1.2, 1.3, 1.5, 1.6, 1.7 (defining Licensed Products as polypropylene paint rollers that are covered by a valid claim of the '790 Patent).

58. *See id.* § 3.2 (requiring Linzer to pay royalties for Licensed Products it manufactures).

59. *See id.* § 14.4 (Linzer warrants that it will not manufacture Polypropylene Paint Rollers that are not Licensed Products).

according to Sekar, a declaratory judgment that Linzer's two-ply process is not covered by the '790 Patent would not end the dispute between the parties.

Nonetheless, Count V cannot be dismissed as futile. Resolution of this claim would determine whether Linzer's two-ply rollers are Licensed Products. Although this determination would not resolve every issue raised in this dispute, it does address a major question: the scope of the '790 Patent. As a result, the claim is not futile and Sekar's motion to dismiss Count V is denied.

### 3. Claims Seeking a Declaratory Judgment that Section 14.4 of the 1998 Agreement Is Unenforceable (Counts VII(A)-(E))

In Count VII, Linzer seeks a declaratory judgment that section 14.4 of the Agreement is unenforceable because it conflicts with various federal and state laws prohibiting anticompetitive conduct. Count VII is divided into six sub-counts, VII(A)-(F),[60] each of which (1) seeks a declaratory judgment that section 14.4 of the 1998 Agreement is unenforceable and (2) names a federal or state law or doctrine that, according to Linzer, would be violated if section 14.4 was enforced, including the doctrine of patent misuse and federal and state antitrust laws. In addition, some of the sub-counts also seek damages and injunctive relief. In light of this complexity each sub-count will be addressed as a separate Count.

### a. Linzer's Allegations Do Not State a Claim for Declaratory Judgment of Patent Misuse (Count VII(A))

■ In Count VII(A), Linzer seeks a declaratory judgment that section 14.4 of the Agreement is unenforceable because in imposing that condition, Sekar committed patent misuse, which is the unlawful extension of a patent monopoly.

Patent misuse is an equitable defense to patent infringement. It "arose to restrain practices that did not in themselves violate any law, but that drew anticompetitive strength from the patent right, and thus were deemed to be contrary to public policy." The purpose of the patent misuse defense "was to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right." As the Supreme Court has explained, the doctrine of patent misuse bars a patentee from using the "patent's leverage" to "extend the monopoly of his patent to derive a benefit not attributable to the use of the patent's teachings," such as requiring a licensee to pay a royalty on products that do not use the teaching of the patent. The "key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect."[61]

■ Linzer alleges that Sekar "has monopolized, attempted to monopolize and restrain trade unreasonably in the relevant market through the exclusionary acts set forth below"[62] and that Sekar "has devel-

---

**60.** Sekar's motion to dismiss challenges only Counts VII(A)-(E).

**61.** *U.S. Philips Corp. v. International Trade Comm'n*, 424 F.3d 1179, 1184–85 (Fed.Cir. 2005) (quoting *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed.Cir.1992); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135–36, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); and *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed.Cir. 1998)).

**62.** Compl. at ¶ 173.

oped and enforced throughout the United States a policy, pattern, practice, of exclusionary dealing, pursuant to which Mr. Sekar will license only to manufacture[r]s and distributors that agree not to manufacture polypropylene paint rollers using any other technologies." [63] Not surprisingly, these allegations and others in Count VII(A) sound like antitrust claims. Patent misuse, which developed long before the advent of antitrust law, has largely merged with antitrust law. "Misuse is closely intertwined with antitrust law, and most findings of misuse are conditioned on conduct that would also violate the antitrust laws." [64] The particular form of misuse alleged in Count VII(A) is Sekar's refusal to license the '790 Patent unless Linzer agreed to an exclusive dealing arrangement. Since the enactment of the Patent Misuse Reform Act of 1988, imposing conditions on a patent license is not patent misuse unless the patentee has power in the relevant market.

> (d) No patent owner otherwise entitled to relief for infringement ... of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having ... (3) sought to enforce his patent rights against infringement ... (4) refused to license or use any rights to the patent; or (5) conditioned the license of any

rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned. [65]

A patentee's market power is necessary, but not sufficient, for a finding of patent misuse based on conditional licensing. [66] Historically, courts have acknowledged a presumption of monopoly power from the mere possession of a patent, but more recently, courts have expressly rejected such a presumption, holding that "in [both patent misuse and antitrust] cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." [67]

Sekar argues that Count VII(A) should be dismissed because Linzer improperly invokes the doctrine of patent misuse as an independent cause of action. [68] This argument is without merit. In *B. Braun Medical, Inc. v. Abbott Labs.*, the Federal Circuit held that while patent misuse may satisfy an element of a plaintiff's antitrust claim, a plaintiff may not recover *damages* when seeking a declaratory judgment of patent misuse. [69] *B. Braun* did not pro-

---

63. *Id.* at 174.

64. Herbert Hovenkamp, Mark D. Janis & Mark A. Lemley, *IP and Antitrust* § 3.1 (2002 & 2007 Supp.).

65. 35 U.S.C. § 271(d) (including the Patent Misuse Reform Act of 1988, codified at 35 U.S.C. § 271(d)(4)-(5)).

66. *See U.S. Philips Corp.*, 424 F.3d at 1186 ("Because the statute [35 U.S.C. § 271(d)] is phrased in the negative, it does not require that patent misuse be found in the case of all such conditional licenses in which the patent owner has market power; instead, the statute simply excludes such conditional licenses in

which the patent owner lacks market power from the category of arrangements that may be found to constitute patent misuse.").

67. *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 126 S.Ct. 1281, 1293, 164 L.Ed.2d 26 (2006).

68. *See* Def. Mem. at 26 (citing *Illinois Tool Works*, 126 S.Ct. at 1288); Def. Rep. at 10.

69. *See* 124 F.3d 1419, 1428 & n. 5 (Fed.Cir. 1997) ("[patent misuse] may not be converted to an affirmative claim *for damages* simply by restyling it as a declaratory judgment counterclaim" (emphasis added)).

scribe claims seeking a declaratory judgment of patent misuse. Indeed, in later actions, the Federal Circuit has allowed such claims without comment.[70] Linzer's patent misuse claims—in Counts VII(A) and XII—seek a declaratory judgment, not damages.

However, Sekar also argues—correctly—that Linzer fails to allege a relevant market in which Sekar has monopoly power. As explained below with respect to Linzer's antitrust claims, Linzer's allegations do not allow even an inference of a relevant market in which Sekar has monopoly power.[71] This failure is fatal to Linzer's patent misuse claim in Count VII(A). Sekar's motion to dismiss Count VII(A) is granted.

**b. Linzer's Allegations Do Not State a Claim Under Section 1 of the Sherman Act (Count VII(B))**

In Count VII(B), Linzer seeks a declaratory judgment that section 14.4 of the Agreement is unenforceable on the grounds that this section, as interpreted by Sekar, is an unreasonable restraint on competition in violation of section 1 of the Sherman Act.[72] Linzer alleges that enforcement of section 14.4 of the Agreement would result in an injury to competition. "Sekar has admitted that the tie-out covenant imposed on Linzer which compels Linzer to manufacture only polypropylene paint rollers made allegedly under [Sekar's] '790 Patent process is a restriction on competition by Linzer." [73] According to Linzer, section 14.4 chills innovation by preventing Linzer from using competing manufacturing technologies, thus reducing the demand for superior one-ply manufacturing processes, which processes could reduce prices for consumers.[74] That is, without section 14.4, Linzer (and others who could sell Linzer such a process) would have greater incentive to compete by creating improved manufacturing processes. Sekar argues that Count VII(B) should be dismissed because Linzer fails to properly define a relevant market and fails to allege harm to competition within that (allegedly improperly-defined) market.

"In order to survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized." [75] "A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.' Products will be considered to be reasonably interchangea-

---

70. *See, e.g., Inamed v. Kuzmak,* 249 F.3d 1356, 1362 (Fed.Cir.2001) (reversing district court's dismissal of plaintiff's "[patent] misuse cause of action" in a declaratory judgment action); *Competitive Techs., Inc. v. Fujitsu Ltd.,* 374 F.3d 1098, 1101 (Fed.Cir.2004) ("The district court dismissed Counterclaim 5 (for a declaratory judgment of unenforceability of the '349 and '400 patents) for failure to state a claim upon which relief could be granted, but only 'to the extent that Fujitsu seeks a broader remedy' than a declaration of unenforceability of the patent based on the University's alleged patent misuse.").

71. *See infra* Part IV.B.3.b.

72. *See* 15 U.S.C. § 1.

73. Compl. at ¶ 190. *See also id.* at ¶ 179 ("the sole purpose of the restrictive covenant of § 14.4 of the Agreement is to require Linzer not to deal in products that compete with the process allegedly covered by the '790 Patent").

74. *See id.* at ¶ 191; Linzer's Memorandum of Law in Opposition to Sekar's Motion to Dismiss ("Pl. Opp.") at 28–29.

75. *Global Disc. Travel Servs, LLC v. Trans World Airlines, Inc.,* 960 F.Supp. 701, 704 (S.D.N.Y.1997).

ble if consumers treat them as 'acceptable substitutes.' " [76]

Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.[77]

Linzer's definition of its relevant market is unclear—the Amended Complaint states that the relevant market is "the market for one-ply rollers made pursuant to *the one-ply process* [.]" [78] In the context of Linzer's other allegations, this phrase could be read to mean the market for one-ply rollers manufactured according to (a) *Linzer's* one-ply process, (b) the '790 process, or (c) *any* one-ply process (*i.e.*, all one-ply rollers). Under any of these three definitions, Linzer's Sherman Act claims fail.

*First*, it would strain credulity to narrow the relevant product market to rollers produced by *Linzer's* one-ply process. Linzer offers no support for the proposition that there are no substitutes for *its* one-ply rollers. Indeed, for a product as uncomplicated as a paint roller, Linzer's allegation that its competitors are also using the '790 process implies that Linzer's one-ply rollers would be interchangeable with those of the competitors in the consumer's eyes. Such a market definition would be inadequate because it fails to distinguish the included products from the excluded products.[79] Without a properly-defined market, Linzer cannot state a claim for a violation of the Sherman Act.

*Second*, if the relevant product market is the market for '790–process rollers, and assuming that Sekar has power in that market, Linzer's claim fails because the exclusive dealing arrangement of section 14.4 cannot be an unreasonable restraint. It gives Sekar nothing more than his due as an owner of the '790 Patent. Vertical exclusive dealing arrangements such as section 14.4 of the Agreement are presumptively lawful,[80] and a patentee is entitled to impose conditions on licenses or refuse to grant licenses entirely.[81] Linzer

---

**76.** *Pepsico, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir.2002) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) and *FTC v. Cardinal Health, Inc.*, 12 F.Supp.2d 34, 46 (D.D.C.1998)). *Accord Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").

**77.** *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997) (citations omitted).

**78.** Compl. at ¶¶ 186, 205 (emphasis added).

**79.** *See Pepsico*, 315 F.3d at 105.

**80.** *See id.* at 110. Linzer's arguments appear to conflate the vertical dealing arrangement

presented in this case with their more-suspect cousins, horizontal dealing arrangements. The arrangement here is vertical because Sekar is a vendor, selling Linzer an input (a manufacturing process) into Linzer's end product (paint rollers). Sekar *is not* a competitor of Linzer in the market for paint rollers, thus their relationship cannot be characterized as horizontal.

**81.** *See, e.g.*, 35 U.S.C. § 271(d)(4)-(5); *Applera Corp. v. MJ Research, Inc.*, 349 F.Supp.2d 321, 328 (D.Conn.2004) ("A patent holder ... has a legal monopoly and significant freedom to license or refuse to license the use of the patented invention, including 'to exact royalties as high as he can negotiate with the leverage of that monopoly.'" (quoting *Brulotte v. Thys Co.*, 379 U.S. 29, 33, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964))). A patentee's right to refuse or impose conditions on a license may be diminished where the patentee

argues that the only effect of section 14.4 is anticompetitive, allowing Sekar to achieve or maintain a monopoly. But this view overlooks the pro-competitive effects of the patent right, to wit, the incentive for Sekar and others like him to innovate. During the term of the '790 Patent, any power Sekar might have in the '790–process roller market is a legitimate result of Sekar's monopoly right as owner of that patent. Thus, Linzer's Sherman Act claims fail for lack of an *unreasonable* restraint on competition.

*Third,* if the relevant product market is the market for one-ply rollers in general, then Linzer fails to allege facts that allow an inference of the required anticompetitive effect. At most, two of the four major competitors in the one-ply roller market are licensed by Sekar.[82] Thus, efforts by Sekar to exert monopoly power—assuming, again, that he had such power[83]—by raising license fees might raise costs of production for Sekar's licensees, but would not raise costs for the other two competitors, who would simply undercut Sekar's licensees on price. The licensees would doubtless be injured—and could perhaps seek redress through other means—but there would be no harm to competition in the one-ply roller market or to the consumers of that product. "The antitrust laws were enacted for 'the protection of

*competition,* not *competitors.'* "[84] "Other allegations in the amended complaint, as well as common knowledge, make it clear that other large competitors ... compete in the [one-ply paint-roller] market. Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted."[85]

Further, Sekar's exclusive dealing arrangement with Linzer does not alone establish—nor do Linzer's allegations support the inference of—a "pattern and practice" of monopolistic conduct, as Linzer alleges. Sekar is entitled to his patent right. Linzer's allegation—that Sekar's imposition of an exclusive dealing arrangement on Linzer tends to inhibit innovation of new manufacturing techniques—is negated by Sekar's patent right to impose such conditions. After all, Sekar's innovation of the '790 process was motivated by the incentive of the patent right. Linzer cannot argue that the legitimate rewards of past innovation inhibit future innovation. Accordingly, Linzer fails to state a claim under the Sherman Act, and Sekar's motion to dismiss Count VII(B) is granted.

**c. Linzer's Allegations Do Not State a Claim for a Violation of Section 3 of the Clayton Act (Count VII(C))**

In Count VII(C), Linzer seeks a declaratory judgment that section 14.4 of the

---

refuses to license a *horizontal* competitor. Here, however, the relationship between the parties is vertical.

**82.** Compl. at ¶ 169 ("three of the four major manufacture[r]s and distributors of polypropylene paint rollers in the United States make one-ply rollers pursuant to the [one]-ply process, which Mr. Sekar alleges falls within his '790 Patent"). One of the three manufacturers that use the '790 process is Newell, Sekar's co-owner of the '790 Patent. Thus, Sekar licenses only two of the four major competitors in the one-ply roller market.

**83.** Sekar has limited control of the competitors in this market. Only two of the four competitors are licensees of the '790 Patent and there is no allegation that Sekar has an exclusive dealing arrangement with any manufacturer other than Linzer.

**84.** *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (quoting *Brown Shoe,* 370 U.S. at 320, 82 S.Ct. 1502).

**85.** *Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.,* 129 F.3d 240, 245 (2d Cir.1997).

Agreement is unenforceable because enforcement would violate section 3 of the Clayton Act, and also seeks treble damages, injunctive relief, and fees and costs under the Act.[86] Sekar moves to dismiss Count VII(C) for failure to state a claim because section 3 of the Clayton Act, which is limited to leases or sales of commodities, is inapplicable to the parties' 1998 Agreement, which is principally a patent licensing agreement (rather than a sale or lease of tangible goods).[87] Linzer does not dispute that section 3 of the Clayton Act governs sales of tangible goods, but rather argues that section 3 governs the 1998 Agreement because the Agreement *includes* a sale of goods. Indeed, Sekar promised to—and actually did—deliver and install two roller-manufacturing machines at Linzer's facilities.[88] However, it is not dispositive that a contract merely *includes* a sale of goods.

> When the subject of a contract is a combination of both tangible goods and intangible rights or services, the contract is covered by the [Clayton Act, as modified by the Robinson–Patman Act] if its "dominant nature" or purpose is the sale of tangible products rather than the transfer of intangible rights or services.[89]

It is beyond cavil that the dominant purpose of the 1998 Agreement was to license Sekar's intellectual property rights to Linzer to allow it to manufacture paint rollers pursuant to these rights. The bulk of the Agreement (entitled "License Agreement") is concerned with specifying and licensing Sekar's patent rights, trade secrets, and know-how in exchange for cash and royalties to be paid. Linzer has paid Sekar "nearly $ 11 million in royalty payments" pursuant to the licensing provisions of the Agreement, while the purchase-and-sale provisions set a price of $150,000 for the two machines Sekar delivered.[90] Moreover, "contracts that explicitly grant a license to exploit the intellectual property contained in a commodity have been viewed as primarily concerned with intangible rights, and are therefore not covered by the Act."[91] Accordingly, Sekar's motion to dismiss Count VII(C) is granted.

### d. Linzer's Allegations Do Not State a Claim for Violation of Section 2 of the Sherman Act (Count VII(D))

In Count VII(D), Linzer alleges that Sekar's actions constitute a monopolization and attempted monopolization in violation of section 2 of the Sherman Act, and accordingly seeks treble damages, injunctive relief, and a declaratory judgment that section 14.4 of the Agreement is unenforceable.[92]

> [I]n order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acqui-

---

86. *See* 15 U.S.C. § 14.

87. *See Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 155 (2d Cir.2004) ("Courts have strictly construed this term ["commodities"], holding that it denotes only 'tangible products of trade.' ").

88. *See* Agreement §§ 11.1–11.2.

89. *Innomed*, 368 F.3d at 156 (citing *Tri–State Broad. Co., Inc. v. United Press Int'l, Inc.*, 369 F.2d 268, 270 (5th Cir.1966) and *Ambook*

*Enters. v. Time Inc.*, 612 F.2d 604, 609 n. 6 (2d Cir.1979)).

90. Compl. at ¶ 25. *See also* Agreement § 11.1.

91. *Innomed*, 368 F.3d at 161 n. 4 (citing *La Salle Street Press, Inc. v. McCormick & Henderson, Inc.*, 293 F.Supp. 1004, 1006 (N.D.Ill.1968)).

92. *See* 15 U.S.C. § 2; Compl. at ¶¶ 204–212.

sition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." To state an attempted monopolization claim, a plaintiff must establish "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."[93]

As discussed earlier with respect to Linzer's claims under section 1 of the Sherman Act, Linzer fails to allege a relevant market in which Sekar possesses or could possess monopoly power for purposes of its Sherman Act claims. Accordingly, Sekar's motion to dismiss Count VII(D) is granted.

### e. Linzer's Allegations Do Not State a Claim for Violation of the Donnelly Act (Count VII(E))

In Count VII(E), Linzer seeks a declaratory judgment that section 14.4 of the Agreement is unenforceable because it violates New York's Donnelly Act, an analog of the Sherman Act intended for cases in which the interstate commerce requirement is not met. "The Donnelly Act was modeled after the Sherman Act, and the courts generally apply federal antitrust precedent in construing it."[94] Neither party argues that the Donnelly Act should

be applied differently in this case. Sekar correctly notes that "the Donnelly Act requires all of the elements of a Sherman Act claim."[95] Thus, Sekar argues, because these two Acts have the same elements and are applied similarly, and because Linzer's Sherman Act claims must be dismissed, the Donnelly Act claims must be dismissed as well. Indeed, Linzer's Donnelly Act claims succeed or fail with its Sherman Act claims, and as discussed above, Linzer failed to adequately plead its Sherman Act claims. Thus, Linzer's Donnelly Act claims are also insufficiently pled, and Sekar's motion to dismiss Count VII(E) is granted.

### 4. Linzer's Allegations State a Claim for a Declaratory Judgment that Sekar May Not Terminate the Agreement (Count X)

In Count X, Linzer seeks a declaratory judgment, on the grounds of unclean hands, that Sekar may not terminate or act contrary to the Agreement.[96] Sekar argues that Count X, like Count I, should be dismissed because Linzer fails to allege that Sekar has threatened termination. As discussed above with respect to Count I,[97] Linzer does sufficiently allege that Sekar threatened termination. Therefore, Sekar's motion to dismiss Count X is denied.

**93.** *Pepsico,* 315 F.3d at 105 (citations omitted) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) and *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)).

**94.** *Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.,* 190 F.Supp.2d 600, 617 (S.D.N.Y. 2002).

**95.** Def. Mem. at 19. *See Benjamin of Forest Hills Realty, Inc. v. Austin Sheppard Realty, Inc.,* 34 A.D.3d 91, 94, 823 N.Y.S.2d 79 (2d Dep't 2006) ("The Sherman Act (15 U.S.C. § 1) and the Donnelly Act require identical basic elements of proof....").

**96.** *See id.* at ¶ 255. Ordinarily, such a claim would be brought as a defense to an infringement suit, but, as discussed above, Linzer need not wait until Sekar terminates the Agreement. Termination of the license agreement would leave Linzer with the rock-and-a-hard-place choice to cease manufacturing operations or facing an infringement suit. The Declaratory Judgment Act was designed to prevent such situations.

**97.** *See supra* Part IV.A.1.

### 5. Linzer's Allegations State a Claim for a Declaratory Judgment that a Breach of Section 14.4 Is Not Material (Count XIII)

 Sekar argues that Linzer has not alleged facts sufficient to sustain its claim for a declaratory judgment that Linzer's breaches of section 14.4 of the Agreement, if any, were not material. If Linzer's two-ply process is found to fall within the claims of the '790 Patent, Linzer would not be in breach of section 14.4. However, if Linzer's allegation that its two-ply process falls outside the '790 Patent is correct, then Linzer would be in breach of section 14.4, raising the question of whether such breach is material.

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> * * *
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[98]

Sekar's acceptance of royalties for Linzer's use of its two-ply process suggests that even if such use was a breach of section 14.4, Sekar was not deprived of the benefit he expected under the Agreement. Further, Sekar's acceptance of royalties and his offer to "revise" the Agreement to explicitly permit Linzer to use its two-ply process (at a higher royalty rate) demonstrate that Sekar *can* be compensated for such a breach.[99] Linzer's payment of two-ply royalties with reservations, along with its investment in Sekar's processes, indicate that if Linzer is found in breach of section 14.4, such breach is likely to be cured by Linzer's payment of royalties.[100] Finally, Linzer's payment of the disputed royalties with reservation and explanations of its reasons for reservation (rather than a total refusal to pay disputed royalties) evince good faith and fair dealing on its part. Accordingly, Linzer alleges facts sufficient to state a claim for a declaratory judgment that its breaches, if any, of section 14.4 of the Agreement were not material breaches of the Agreement as a whole.

### C. Patent Claims (Counts XI, XII)

 In Counts XI and XII, Linzer seeks declaratory judgments that both patents-in-suit are invalid (Count XI) and unenforceable (Count XII).[101] Sekar argues that both counts must be dismissed because Linzer, "a licensee without a reasonable apprehension of suit, cannot challenge the validity of" the patents-in-suit for want of a case or controversy, as is required to invoke the Declaratory Judgment Act.[102]

---

**98.** Restatement (Second) of Contracts § 241 (1979).

**99.** *See* Compl. at ¶¶ 59, 71.

**100.** *See id.* at ¶¶ 53, 77, 79.

**101.** For convenience, the concepts of "invalidity and unenforceability will be referred to

simply as invalidity[.]" *MedImmune*, 127 S.Ct. at 768 n. 1.

**102.** Def. Mem. at 20. *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other

According to Sekar, Linzer cannot have a reasonable apprehension of an infringement suit because Sekar is incapable of bringing such a suit without Newell, the co-owner of the '790 Patent.[103]

Sekar's argument relies on the Federal Circuit's "reasonable apprehension of suit" test for evaluating the existence of a case or controversy in a suit for declaratory judgment of invalidity of a patent—a test which the Supreme Court rejected in *MedImmune v. Genentech*.[104] The *MedImmune* Court wrote:

> *Aetna* and the cases following it do not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not. Our decisions have required that the dispute be "definite and concrete, touching the le-

gal relations of parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." In *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, we summarized as follows: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[105]

The Federal Circuit has acknowledged the rejection of its standard and has decided subsequent cases in accordance with *MedImmune*.[106]

---

legal relations of any interested party seeking such declaration...."). The Supreme Court has "explained that the phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the types of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune*, 127 S.Ct. at 771 (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937)).

**103.** *See Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1467 (Fed.Cir.1998) ("An action for infringement must join as plaintiffs all co-owners.") (citing *Waterman v. Mackenzie*, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1891)). Linzer denies that Newell is a necessary party to this dispute, but nonetheless requests permission to join Newell as a declaratory judgment defendant. *See* 5/2/07 Walter Letter at 1–2. Though Newell may not be a necessary party, *see infra* note 104, this action could result in the invalidation of the '790 Patent, thus Newell should be notified of the action and invited to join as a defendant. Accordingly, Linzer's request for permission to add Newell as a party is granted.

**104.** *See MedImmune*, 127 S.Ct. at 774 n. 11 (noting that the Federal Circuit's "reasonable apprehension of suit" test conflicted with *Altvater v. Freeman*, 319 U.S. 359, 365, 63 S.Ct.

1115, 87 L.Ed. 1450 (1943), *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 81 L.Ed. 617 (1937), and *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), and was in tension with *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 98, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993)). Though the "reasonable apprehension of suit" standard is no longer the law, Sekar's argument would fail even under that test. As discussed below, Linzer's apprehension of suit is not extinguished simply because the potential exists for Newell to exercise its "right to impede the other co-owner's [Sekar's] ability to sue infringers by refusing to voluntarily join in such a suit." *Ethicon*, 135 F.3d at 1468. Newell, Linzer's direct competitor, has sued Linzer in the past for infringement of another patent in this field. *See* Pl. Opp. at 15. Moreover, Sekar is the *sole* owner of the '134 Patent, and is thus immediately capable of suing for infringement of that patent.

**105.** *MedImmune*, 127 S.Ct. at 771 (citations omitted; alteration in original) (quoting *Aetna*, 300 U.S. at 240–41, 57 S.Ct. 461).

**106.** *See, e.g., SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380–81 (Fed. Cir.2007) ("In finding declaratory judgment

The instant dispute satisfies the case or controversy standard as explained in *MedImmune* for several reasons. *First,* Linzer and Sekar are undoubtedly parties with adverse interests in their legal relations with respect to the Agreement and the patents-in-suit. The interpretation of the Agreement and the validity and possible infringement of the patents-in-suit will determine whether Linzer must pay royalties or breach damages to Sekar, or may be enjoined from manufacturing infringing rollers.

*Second,* the controversy between Linzer and Sekar is "real and substantial." Their dispute—over royalties, breach, and patent validity and infringement—has been festering for over a year now. The parties remain at an impasse after substantial negotiation and renegotiation.

*Third,* this case does not require suppositions about "a hypothetical state of facts" because the facts are amply developed. The 1998 Agreement is a signed, operative document, under which the parties have been performing for eight years. Linzer's potentially-infringing activities are real and known: during the performance of the Agreement, Linzer has been manufacturing rollers using its one- and two-ply processes—processes which Sekar claims infringe the patents-in-suit. Sekar filed several patent applications, including those applications which matured into the patents-in-suit. The prosecution histories of those applications contain evidence that bears on the alleged invalidity of those patents and of Sekar's knowledge of such invalidity (and thus his alleged breach of warranty).

*Finally,* the controversy would be resolved by the declaratory judgments Linzer seeks. Such judgments would provide Linzer with relief by clarifying whether royalties are owed, whether its processes infringe either or both of the patents-in-suit, whether those patents are valid, and what rights the parties have under the Agreement. Indeed, Sekar invited such a judgment by stating that he would be "happy to meet with Linzer to discuss renegotiation of the License Agreement[,]" but that he "want[ed] it to be clear that if we [Linzer and Sekar] cannot reach agreement, Mr. Sekar intends to let a Court decide the legal issues."[107] "The Declaratory Judgment Act was designed to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure or never."[108] In sum, this case presents a case or controversy sufficient for plaintiff to invoke the Declaratory Judgment Act, and this Court has jurisdiction to issue the declaratory judgments sought in the Complaint. Accordingly, Sekar's motion to dismiss is denied as to Count XI.

Sekar further argues with respect to Count XII that patent misuse is not a cause of action. This argument fails for the same reasons discussed above regarding Count II.[109] However, Count XII must be dismissed for a different reason: it is superfluous. Count XII seeks a declaratory judgment that the patents-in-suit are unenforceable on the grounds of patent misuse. The patent misuse alleged in Count XII is that Sekar attempted to enforce invalid patents (the patents-in-

jurisdiction in *MedImmune*, the Court specifically addressed and rejected our reasonable apprehension test[.]'").

**107.** 11/2/06 Mandel Letter at 1–2.

**108.** *Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,* 433 F.3d 1199, 1243 (9th Cir.2006).

**109.** *See supra* Part IV.A.2.

suit).[110] For Linzer to. prevail on this claim, then, the patents-in-suit must be shown to be invalid. Thus, Count XII is duplicative of Count XI. Count XI seeks a declaratory judgment that the patents-in-suit are invalid, and if it succeeds—*i.e.*, if the patents-in-suit are invalidated—then the patents will be unenforceable, which is the very relief sought by Count XII. Therefore, Sekar's motion to dismiss is granted as to Count XII.

## V. CONCLUSION

For the reasons discussed above, defendant's motion to dismiss is granted with respect to Counts VIII, VII(A)-(E), and XII; it is denied with respect to Counts I–II, IV–V, X–XI, and XIII. The Clerk of the Court is directed to close this motion (document # 24). A conference is scheduled for August 9, 2007, at 4:30 p.m. in Courtroom 15C.

SO ORDERED.

---

**110.** *See* Compl. at ¶ 265 ("Sekar has attempted to enforce the [patents-in-suit] against Linzer ... knowing that [they] were invalid").