**PEPSICO, INC., Plaintiff–Appellant,**

v.

**The COCA–COLA COMPANY, Defendant–Appellee.**

**Docket No. 00–9342.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 11, 2001.

Decided: Dec. 24, 2002.

Thomas F. Cullen, Jr., Washington, DC (Robert H. Rawson, Jr., Jones, Day, Reavis & Pogue, Washington, DC; Richard C. Weisberg, Merion, Pa.; Randolph S. Sherman, Richard M. Steuer, Kaye Scholer LLP, New York, NY; Gerard W. Casey, PepsiCo, Inc., Purchase, NY, on the brief), for Plaintiff–Appellant.

Jonathan M. Jacobson, New York, N.Y. (Daniel F. McInnis, Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York, NY; James M. Koelemay, Jr., Joel M. Neuman, Kenneth L. Glazer, The Coca–Cola Company, Atlanta, GA; Michael C. Russ, Jeffrey S. Cashdan, King & Spalding, Atlanta, GA, on the brief), for Defendant–Appellee.

Before: NEWMAN and KEARSE, Circuit Judges.*

PER CURIAM:

Plaintiff-appellant PepsiCo, Inc. ("PepsiCo") appeals from the judgment of the United States District Court for the Southern District of New York (Loretta A. Preska, District Judge), entered September 25, 2000, granting summary judgment in favor of defendant-appellee The Coca–Cola Company ("Coca–Cola") on PepsiCo's claims that (1) Coca–Cola's enforcement of loyalty provisions in its distributorship agreements with independent food service distributors ("IFDs") that prohibit the IFDs from delivering PepsiCo products to any of their customers constitutes monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and (2) the inclusion and enforcement of the loyalty provisions in Coca–Cola's

---

* Honorable John M. Walker, Jr., Chief Judge of the United States Court of Appeals for the Second Circuit, originally a member of the panel, recused himself after oral argument, and the appeal is being disposed of by the remaining members of the panel, who are in agreement. *See* Second Circuit Local Rule § 0.14(b); *Murray v. Nat'l Broad. Co.,* 35 F.3d 45, 47, 48 (2d Cir.1994).

agreements amounts to concerted action by Coca–Cola and the IFDs in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Having thoroughly reviewed the record and the parties' arguments, we affirm the district court's grant of summary judgment in favor of Coca–Cola and, except where noted, adopt the district court's reasoning set forth in its thorough and persuasive opinion. *See PepsiCo, Inc. v. Coca–Cola Co.,* 114 F.Supp.2d 243 (S.D.N.Y.2000).

## Background

Coca–Cola and PepsiCo, in addition to selling their famous beverages in bottles and cans, sell fountain syrup to numerous customers, including large restaurant chains, movie theater chains, and other "on-premise" accounts. PepsiCo and Coca–Cola bid for agreements to supply fountain syrup and negotiate a price directly with the customer, and then pay a fee to a distributor to deliver the product. Historically, PepsiCo delivered fountain syrup primarily through bottler distributors; Coca–Cola delivered fountain syrup through bottler distributors as well as IFDs, who can offer customers one-stop shopping for all of their restaurant supplies. In the late 1990s, PepsiCo decided it wanted to start delivering fountain syrup via IFDs, but when it sought to do so, Coca–Cola began to enforce the so-called "loyalty" or "conflict of interest" policy contained in its agreements with IFDs, which provides that distributors who supply customers with Coca–Cola may not "handle[ ] the soft drink products of [PepsiCo]." *PepsiCo,* 114 F.Supp.2d at 245. IFDs who breach the loyalty policy risk termination by Coca–Cola. As the district court observed, "a distributor subject to the loyalty policy can supply all its customers with either Pepsi or Coke, not both. Because distributors are given an all or nothing choice, a customer of a distributor subject to Coca–Cola's loyalty policy who wants Pepsi will have to go elsewhere to get it." *Id.* at 245–46.

PepsiCo filed this antitrust complaint alleging that the loyalty provisions constituted an illegal monopolization and attempted monopolization under Section 2 of the Sherman Act. PepsiCo later amended its complaint to add a claim that Coca–Cola and the IFDs had entered into an illegal horizontal conspiracy to restrain trade, in violation of Section 1 of the Sherman Act.

The district court denied Coca–Cola's motion to dismiss, finding that PepsiCo's allegations, if supported by evidence, could make out a monopolization claim. Following eighteen months of aggressive discovery, however, the district court granted Coca–Cola's motion for summary judgment, largely on the basis that PepsiCo had failed to introduce sufficient evidence on any of its claims to raise a triable issue. *Id.* at 245, 258 n. 7. This appeal followed.

## Discussion

### I. Legal Standard

We review the district court's grant of summary judgment *de novo. Beckford v. Portuondo,* 234 F.3d 128, 130 (2d Cir.2000) *(per curiam ).* Summary judgment is appropriate only where, "[e]xamining the evidence in the light most favorable to the nonmoving party," *Adjustrite Sys., Inc. v. Gab Bus. Servs., Inc.,* 145 F.3d 543, 547 (2d Cir.1998), the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c). In the context of antitrust cases, however, summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces. *See Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d

90, 95 (2d Cir.1998). Although all reasonable inferences will be drawn in favor of the non-movant, those inferences "must be reasonable in light of competing inferences of acceptable conduct." *Id.*

Moreover, as noted by the district court, " 'the burden on the moving party may be discharged by "showing"—that is pointing out to the district court—that there is an absence of evidence to support the non-moving party's case.' " *PepsiCo,* 114 F.Supp.2d at 247 (*quoting Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."). When the moving party meets this burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

## II. Section 2 of the Sherman Act

■ As noted by the district court, in order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *see Clorox Co. v. Sterling Winthrop, Inc.,* 117 F.3d 50, 61 (2d Cir.1997). To state an attempted monopolization claim, a plaintiff must establish "(1) that the defendant has engaged in predatory or anticompetitive con-

duct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Tops Mkts.,* 142 F.3d at 99–100.

### A. The Relevant Market

■ As an initial matter, it is necessary to define the relevant product and geographic market Coca–Cola is alleged to be monopolizing. *See AD/SAT v. Associated Press,* 181 F.3d 216, 226 (2d Cir.1999); *cf. Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The parties do not dispute that the relevant geographic market is the United States. A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ("*du Pont*"). Products will be considered to be reasonably interchangeable if consumers treat them as "acceptable substitutes." *FTC v. Cardinal Health, Inc.,* 12 F.Supp.2d 34, 46 (D.D.C.1998) ("[T]he relevant market consists of all of the products that the Defendants' customers view as substitutes to those supplied by the Defendants.").

■ In its complaint, PepsiCo defined the relevant market as the "market for fountain-dispensed soft drinks distributed through [IFDs] throughout the United States." Pepsico sought to narrow this market definition on summary judgment by confining it to customers with certain characteristics, specifically "large restaurant chain accounts that are not 'heavily franchised' with low fountain 'volume per outlet.' " *PepsiCo,* 114 F.Supp.2d at 246. The district court rejected this definition on the grounds that 1) it was not substan-

tiated by the evidence; and 2) it was not supported by the practical indicia enunciated in *Brown Shoe*.

Reviewing the evidence submitted on summary judgment, the district court held that fountain syrup delivered by bottler distributors was an "acceptable substitute" for fountain syrup delivered by IFDs—and thus had to be included in the relevant product market—because none of the numerous customers who were deposed or submitted affidavits for the summary judgment motion said that the availability of delivery via IFDs was determinative of its choice of fountain syrup. *See id.* at 250. Tellingly, in PepsiCo's own survey of 99 major customers, the availability of one-stop-shopping IFDs was ranked 35 out of 38 in importance among various factors they considered in choosing a fountain syrup. *See id.* at 252. PepsiCo's internal strategy documents, moreover, repeatedly explain that Coca–Cola has several advantages over PepsiCo in the fountain syrup business, only some of which relate to flexible delivery methods.

The district court also rejected PepsiCo's argument that the relevant market should be confined to certain customers, an argument the district court characterized as "PepsiCo['s attempt] to define the elements of the relevant market to suit its desire for high Coca–Cola market share, rather than letting the market define itself." *Id.* at 249. The district court found that, although the affidavits and exhibits submitted on the summary judgment mo-

tion showed that many customers have a preference for receiving fountain syrup through IFDs because of the advantages provided by one-stop-shopping, these customers did not constitute a discrete group, but rather were included in various groups of fountain syrup customers. *Id.* at 250. Indeed, franchisees, a group PepsiCo sought to exclude from the market definition, purchased 63 percent of the Coca–Cola fountain syrup delivered by IFDs. *See id.* at 257. Identical types of customers expressed preferences for either IFDs or bottler distributors, and most customers stated that method of delivery was simply one of several non-determinative factors they considered in deciding which fountain syrup to stock.[1] *See id.* at 250. We agree with the district court that PepsiCo failed to provide evidentiary support for its market definition restricted by distributor and customer.

The district court's second basis for rejecting PepsiCo's argument that bottler distributors should not be included in the relevant market was that none of the "practical indicia" enunciated in *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502, for determining the existence of a separate submarket would support a finding that fountain syrup delivered by IFDs constitutes a separate submarket. Those indicia are: (1) unique production facilities; (2) specialized vendors; (3) distinct customers; (4) sensitivity to price changes; (5) industry or public recognition of the proposed submarket as a separate economic entity; and (6) peculiar characteristics and uses of

---

1. PepsiCo, citing *AD/SAT*, 181 F.3d at 228, maintains that fountain syrup delivered by IFDs is the relevant market if enough customers have sufficient preference for that product to raise prices "significantly above the competitive level," despite the fact that others might shift to substitutes at supracompetitive prices. PepsiCo also contends that none of the many customers who continue to use or have recently converted to bottler distributors

for delivery of fountain syrup, such as Au Bon Pain, Arthur Treacher's, Sbarros, Hard Rock Café, Planet Hollywood, and major franchise groups of Wendy's, Arby's, and Subways, are "similarly situated" to the type of customer that prefers systems distribution. Although this argument, in theory, may have merit, we agree with the district court that PepsiCo failed to adduce evidence to support its application in this case.

the product. *Id.; see also PepsiCo,* 114 F.Supp.2d at 252–53. With respect to indicia (1) and (2), PepsiCo has not contested the district court's conclusion that fountain syrup delivered by IFDs uses the same production facilities as fountain syrup delivered by other methods and does not require specialized vendors. With respect to indicia (3) through (6), we agree with the district court that they weigh against a finding of a submarket, although we are not as persuaded as was the District Court as to indicium (6). Specifically, the evidence established that there is no discrete class of customers that has such a strong preference for IFDs that it would not consider substitutes if other factors (especially price) changed; the competition between PepsiCo and Coca–Cola demonstrates that there is a high sensitivity to price change between IFD-delivered and bottler-distributor-delivered fountain syrup; and there is no industry recognition of fountain syrup delivered by IFDs as a separate market. *See PepsiCo,* 114 F.Supp.2d at 253–54, 257–58. As PepsiCo's former CEO conceded: "[N]ever ever would I think of or refer to a delivery method as a market." *See id.* at 253. PepsiCo itself stated in its brief that "competition for chain [fountain syrup] business is fought by Coca–Cola and PepsiCo in head-to-head bidding at the retailer level. Once a chain account selects its fountain supplier, the systems distributor acts solely as a conduit, delivering syrup along with the other items the account uses." In short, as the district court observed, "the evidence shows that Coca–Cola viewed PepsiCo as a competitor, and *vice versa,* and that both they and fountain syrup purchasers viewed systems distribution as a competitive advantage, not a separate market." *PepsiCo,* 114 F.Supp.2d at 254. *Compare Cardinal Health,* 12 F.Supp.2d at 49 & n. 10 (finding submarket of drug wholesalers where defendants' documents showed that they "clearly viewed their economic competition to be from their fellow drug wholesalers, and not from the other sources as suggested by the [d]efendants at trial").

## B. Monopoly Power

No doubt disappointed by the district court's rejection of its market definition, PepsiCo argues on appeal that the district court erred in insisting that the relevant market had to be defined before it could determine whether Coca–Cola had monopoly power. PepsiCo points to *du Pont,* 351 U.S. at 393, 76 S.Ct. 994, and argues that in that case the court rejected the government's definition of the relevant market and, instead, focused on direct evidence of monopoly power, *viz.* "the power to control prices or exclude competition." *Id.* at 391, 76 S.Ct. 994; *see also id.* at 393, 403–04, 76 S.Ct. 994. We agree with PepsiCo that there is authority to support its claim that a relevant market definition is not a necessary component of a monopolization claim. *See, e.g., id.* at 391, 76 S.Ct. 994; *Tops Mkts.,* 142 F.3d at 98 (noting that monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market"); *Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 937 (7th Cir.2000) (noting two ways to prove market power: (1) direct proof of anticompetitive effect and (2) defining a relevant market and showing excess market share there); 2A Phillip E. Areeda, *et al., Areeda & Hovenkamp's Antitrust Law,* ¶ 531a, at 156 (2002) ("Areeda & Hovenkamp") (stating that a relevant market definition simply serves as a surrogate for market power).

The core element of a monopolization claim is market power, which is defined as "the ability to raise price by restricting output." Areeda & Hovenkamp, *supra,* ¶ 501, at 85. The more com-

petition a company faces, the less it can control prices because competitors will undercut its prices to secure market share. *See generally id.* Conversely, a company that can exclude competition can sustain its ability to control prices and thereby maintain its market power. *See id.* at 85–86. The pertinent inquiry in a monopolization claim, then, is whether the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power.[2] In the absence of direct measurements of a defendant's ability to control prices or exclude competition, however, market power necessarily must be determined by reference to the "area of effective competition"—which, in turn, is determined by reference to a specific, defined "product market." *Brown Shoe*, 370 U.S. at 324, 82 S.Ct. 1502; *see* Areeda & Hovenkamp, *supra*, ¶ 531a, at 156. Thus, as Coca–Cola points out, numerous cases state that defining a relevant market is generally a necessary component of analyzing a monopolization claim. Once a relevant market is determined, the defendant's share in that market can be used as a proxy for market power.

■ More to the point, however, PepsiCo has failed to adduce direct evidence that Coca–Cola has market power (*i.e.*, that it can control prices or exclude competition). To the contrary, the result of PepsiCo's stepped-up attack on the fountain syrup market resulted in numerous bidding wars between PepsiCo and Coca–Cola. PepsiCo was successful in obtaining several accounts, and in those cases where it lost out to Coca–Cola, it nevertheless forced Coca–Cola to drastically reduce its price and profitability to keep the account.

As the district court stated, moreover, it is "[m]ost compelling, [that] *no customer* testified that Coca–Cola's loyalty policy prevented the customer from obtaining Pepsi." *PepsiCo*, 114 F.Supp.2d at 251.

PepsiCo, relying on *United States v. ALCOA*, 148 F.2d 416, 426–27 (2d Cir. 1945) (L.Hand, *J.*), asserts that because the cost of IFDs is allegedly lower than bottlers, Coca–Cola—by controlling this distribution channel—has the opportunity to charge supracompetitive prices. We agree with the district court that this argument fails because no evidence was proffered to establish that it is cheaper for Coca–Cola to deliver fountain syrup through IFDs than through other delivery methods. Indeed, the only evidence we have found concerning Coca–Cola's distribution costs indicates that the costs vary depending on geography and volume, and that bottler distribution is actually a cheaper delivery method at higher volumes and/or remote locations. PepsiCo's "proof" that IFDs are cheaper for Coca–Cola is its assertion that IFDs are cheaper *for PepsiCo*, and that if PepsiCo had access to IFDs, it could lower its prices to its customers. Coca–Cola counters that the lower cost of IFDs for PepsiCo is the result of PepsiCo's recent renegotiation of its bottler distributor contracts, and that before 1997—when PepsiCo used bottlers almost exclusively—bottler distribution was a cheaper delivery method for Pepsi-Co. PepsiCo has not disputed this allegation.

That PepsiCo could lower prices if it used IFDs does not create a triable issue with respect to whether Coca–Cola charges supracompetitive prices. As the bidding wars show, moreover, Coca–Cola's alleged control of the distribution process

---

**2.** For a more extensive discussion of these principles, see generally Areeda & Hoven-

kamp, *supra*, ¶ 530.

has not immunized its prices from Pepsi-Co's aggressive challenges. We have previously rejected as speculative similar attempts to argue that monopoly power is established by showing that "competitive advantages ... could have resulted in *potentially* higher prices," in the absence of proof "that prices were *actually* higher." *Tops Mkts.*, 142 F.3d at 96. Thus, the district court could not have ignored the definition of the relevant market in deciding this case because PepsiCo failed to proffer direct evidence that Coca-Cola has monopoly power or a dangerous probability of achieving it.

In sum, we conclude, as did the district court, that PepsiCo's Section 2 antitrust claim fails because fountain syrup distributed by IFDs is not a separate submarket. Moreover, PepsiCo has not sought to argue that Coca-Cola has monopoly power in the broader fountain syrup market. Nor could it; according to PepsiCo's own figures, in 1998, the year it filed this lawsuit, IFDs accounted for only 50.2 percent[3] of all fountain syrup deliveries by the three largest suppliers (Coca-Cola, PepsiCo, and Dr. Pepper/Seven-Up), and Coca-Cola had only a 64 percent share of the total fountain syrup sales by these three suppliers.[4] Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power. *See Tops Mkts.*, 142 F.3d at 99 (holding that "a share between 50% and 70% can occasionally show monopoly power," but only if

other factors support the inference); *AL-COA*, 148 F.2d at 424 (L.Hand, *J.*) (expressing doubt that 64 percent market share is enough to constitute a monopoly).

Accordingly, we hold that the district court properly granted summary judgment in favor of Coca-Cola on PepsiCo's Section 2 monopolization and attempted monopolization claims.

### III. Section 1 of the Sherman Act

■ As the district court noted, to prove a Section 1 violation of the Sherman Act, a plaintiff must show " 'a combination or some form of concerted action between at least two legally distinct economic entities' that 'constituted an unreasonable restraint of trade either per se or under the rule of reason.' " *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 103 (2d Cir.2000) (*quoting Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 542 (2d Cir.1993)).

The gist of PepsiCo's Section 1 claim is that because Coca-Cola assured each of the IFDs that it would uniformly enforce similar loyalty agreements with other IFDs, Coca-Cola's loyalty policy is, in reality, a *per se* illegal horizontal conspiracy among the IFDs and Coca-Cola to boycott PepsiCo. On appeal, PepsiCo argues that the district court erred by requiring that the Section 1 violation be "attributable solely" to concerted actions of the IFDs. This argument is based on a misreading of the district court's opinion. In fact, the district court's decision relied on the Su-

---

**3.** We note that Coca-Cola's figures exclude service distributors that serve only one company's stores (so-called "captive" or "dedicated" distributors) from the IFD category on the ground that, according to Coca-Cola, its loyalty provisions are inapplicable to captive distributors (i.e., because they only carry the fountain syrup their one client purchases). By Coca-Cola's calculations, IFDs accounted for only 32.3 percent of all fountain syrup deliveries in 1998. Because we are reviewing

the district court's grant of summary judgment, we use the figures most favorable to PepsiCo. *See Adjustrite Sys.*, 145 F.3d at 547.

**4.** PepsiCo repeatedly asserts that Coca-Cola has an 80 percent or 84 percent market share, but fails to explain precisely what market it is referring to or how the 80 percent or 84 percent figures were derived.

preme Court's admonition that " 'precedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors.' " *Pepsi-Co*, 114 F.Supp.2d at 259 (*quoting NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 134, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998)). The district court properly interpreted *NYNEX* as requiring "an agreement between or among direct competitors," and found that PepsiCo had failed to adduce any evidence of a horizontal agreement among the IFDs. *Id.*

■ The district court correctly rejected PepsiCo's Section 1 claim on the ground that it failed to proffer sufficient evidence of a horizontal agreement among the IFDs. PepsiCo offered no evidence of direct communications among the IFDs; its "offer of proof" of an agreement was simply that Coca–Cola assured the IFDs that the loyalty policy would be uniformly enforced and encouraged them to report violations. We agree with the district court that this was insufficient evidence of a horizontal agreement to withstand summary judgment.

In addition, all of the cases relied on by PepsiCo to argue that it established a "hub and spokes" conspiracy are inapposite or distinguishable. Most of these cases concerned price-fixing, *see, e.g., United States v. Parke, Davis & Co.*, 362 U.S. 29, 32, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) (price fixing among drug wholesalers); *Interstate Cir. v. United States*, 306 U.S. 208, 214, 59 S.Ct. 467, 83 L.Ed. 610 (1939) (price-fixing agreement among movie distributors and exhibitors), which is a *per se* violation regardless of whether the restraint is vertical or horizontal. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 735–36, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("[E]conomic analysis supports the view, and no precedent opposes it, that a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels."); *Capital Imaging*, 996 F.2d at 543 (noting that "[m]ost cases fall outside the[ ] narrow, carefully demarcated categories held to be illegal *per se*," such as horizontal and vertical price-fixing, division of a market into territories, certain tying arrangements, and some group boycotts)(citing cases). Contrary to PepsiCo's reading, *NYNEX*, as discussed above, squarely held that a horizontal agreement is a prerequisite in a group boycott case.

The most factually similar case, *Toys "R" Us*, 221 F.3d 928, is distinguishable for several reasons. First, whereas here we are dealing with exclusive distributorships—which are presumptively legal— *Toys "R" Us* involved a demand by Toys "R" Us of the top ten toy manufacturers that they refuse to sell certain toys to warehouse clubs. *Id.* at 931–32. Thus, unlike here, the established effects of the Toys "R" Us agreement was to limit output (because the warehouse clubs could not obtain the same products from other sources) and to protect Toys "R" Us from competitive prices, both clearly proscribed anticompetitive effects. *Id.* at 936, 937; *see generally* Areeda & Hovenkamp, *supra*, ¶ 530. In addition, the court's bases for holding that a horizontal agreement had been established were that: the manufacturers abruptly shifted their practice of selling to the warehouse clubs; there was direct evidence of communication among the manufacturers; and there was evidence that they only agreed to the demand on the condition that their competitors also agree to go along with it. *Id.* at 932–33, 935–36. Such strong evidence of a horizontal agreement is lacking here. Finally, but we believe significantly, although there was more evidence of a horizontal agreement in *Toys "R" Us* than here, the court in that case repeatedly pointed out that the evidence could be viewed either way,

but that the court was obliged to affirm because the applicable standard of review was the highly deferential "substantial evidence" of agency review. *Id.* at 930, 934–35. Viewing *Toys "R" Us* as representing a minimum evidentiary threshold, we conclude that the district court correctly determined that PepsiCo failed to create a jury issue as to a *per se* Section 1 violation.

Nor is there any basis to conclude that PepsiCo has adequately supported a Section 1 claim under the rule of reason. Such a claim requires a showing of injury to competition in the relevant market. *See Capital Imaging Assocs.,* 996 F.2d at 543. The district court concluded that "[b]ecause PepsiCo has failed properly to define the relevant market here, there can be no Section 1 violation under a rule of reason analysis." *PepsiCo,* 114 F.Supp.2d at 259. PepsiCo half-heartedly argues that it has established a Section 1 violation under the rule of reason because a jury could find that the only purpose and effect of the loyalty provisions was to restrict price and output. This argument fails under the reasoning of *CDC Technologies,* discussed above, because PepsiCo clearly has access to alternative distribution channels. Indeed, PepsiCo has not disputed Coca–Cola's assertions that (1) Coca–Cola has agreements with only 377 out of more than 2000 IFDs; (2) PepsiCo previously owned one of the largest IFDs, but sold it in 1997, the very year it chose to switch to IFDs; (3) PepsiCo has not attempted to use any of the remaining IFDs; and (4) PepsiCo's difficulty in using IFDs and its expense in using bottler distributors is due at least in part to its unique relationship with its bottler distributors and to certain restrictions imposed by them when PepsiCo renegotiated their contracts in 1997. Moreover, Coca–Cola's exclusive distributorships are short in duration and terminable at will, and PepsiCo

has failed to demonstrate any significant anticompetitive effect on the price or output of fountain syrup. *See CDC Techs.,* 186 F.3d at 79–81.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.