12-4689-cv
*Cash & Henderson Drugs v. Johnson & Johnson*

# In the
# United States Court of Appeals
# For the Second Circuit

————

August Term, 2014

No. 12-4689-cv

CASH & HENDERSON DRUGS, INC., OMEGA PHARMACY, LLC, DISCOUNT DRUGS OF ELLIJAY, GA, INC., KLEIN'S PHARMACY & ORTHOPEDIC APPLIANCES, INC., MONROE PHARMACY, INC., TRIANGLE PHARMACY, INC., THE TROUTMAN DRUG CO., GRAVES DRUG STORE EMPORIA, INC., R.H. MOORE DRUG COMPANY OF FRANKLIN, INC., PELTA DRUG, INC., ACKAL'S IBERIA PHARMACY, INC., NORTHPARK PHARMACY, LTD., MILLER DRUGS, INC., RICKMAN & HAILE, INC., COLLINWOOD DRUGS, THRIFTY DRUG STORE, INC., PHARMA-CARD, INC., CREECH DRUG CO., INC., FELDMAN, INC., FAMILY PRESCRIPTION CENTER, INC., HARRAH PHARMACY, INC., DAVID W. GARBER, MARJORIE H. LAMAR, LIVELY DRUG CO., INC.,
*Plaintiffs-Appellants,*

DRUG MART PHARMACY CORP., *ET AL.*,
*Plaintiffs,*

*v.*

JOHNSON & JOHNSON, CAREMARK L.L.C., EXPRESS PHARMACY SERVICES OF PA, L.L.C.,
*Defendants-Appellees,*

AMERICAN HOME PRODUCTS CORP., *ET AL.*,
*Defendants.*[1]

————

—————————

[1] The Clerk of Court is directed to amend the caption as set forth above.

Appeal from the United States District Court
for the Eastern District of New York.
No. 93 CV 5148 (ILG) (SMG) — Steven M. Gold, *Magistrate Judge*.

_____

Argued: February 4, 2015
Decided: August 27, 2015

_____

Before: PARKER, HALL, and LOHIER, *Circuit Judges*.

_____

Plaintiffs-appellants, a group of retail pharmacies, appeal from a judgment of the United States District Court for the Eastern District of New York (Gold, *M.J.*). The district court dismissed their claims under the Robinson-Patman Act and the Clayton Act on the grounds that they had failed to show either competitive or antitrust injury. *See* 15 U.S.C. §§ 13(a), 13(d), 13(f), 15 and 26. **AFFIRMED**.

_____

NICHOLAS A. GRAVANTE, JR. (Steven I. Froot, Michael I. Endler, Robert C. Tietjen, Benjamin D. Battles, *on the brief*), Boies Schiller & Flexner LLP, New York and Albany, NY; (Wyatt B. Durrette, Jr., Kenneth D. McArthur *on the brief*), DurretteCrump PLC, Richmond, VA, *for Plaintiffs-Appellants.*

WILLIAM F. CAVANAUGH JR. (Kathleen M. Crotty, Reed C. Bienvenu, *on the brief)*, Patterson Belknap Webb & Tyler LLP, New York, NY, *for Defendant-Appellee Johnson & Johnson.*

MICHAEL SENNETT (Paul W. Render, Erin L. Shencopp, *on the brief*), Jones Day, Chicago, IL, *for Defendant-Appellees Caremark, LLC, and Express Pharmacy Services of PA, LLC.*

John M. Faust, Law Offices of John M. Faust, Washington, DC, *for Amicus Curiae National Community Pharmacists Association.*

David A. Balto, Law Offices of David A. Balto, Washington, DC, *for Amicus Curiae Organization for Competitive Markets.*

————

BARRINGTON D. PARKER, *Circuit Judge*

Plaintiffs-appellants, a group of twenty-eight retail pharmacies, appeal from a judgment of the United States District Court for the Eastern District of New York (Gold, *M.J.*) dismissing their claims for money damages and injunctive relief under subsections 2(a), 2(d), and 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(a), 13(d), 13(f), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

Defendants-appellees are primarily pharmaceutical manufacturers. It is undisputed that, since the early 1990s, the defendants have offered lower prices—typically through rebates or discounts—on brand name prescription drugs to "favored purchasers." These purchasers include entities such as staff-model health maintenance organizations (HMOs) and pharmacy benefit managers. HMOs provide comprehensive, managed health care by their member physicians with limited referral to outside specialists. As with traditional health insurers, members make regular payments to the organization. Staff-model HMOs offer services provided by the HMO's own staff, rather than by third-party providers that contract with the HMO. Pharmacy benefit managers manage benefits for insurers and HMOs. The pharmacy benefit managers sometimes engage in retail sales directly or through mail-order pharmacies that they control. The drugs in question include a wide variety of brand name medicines, such as Lipitor, Celebrex, and Zoloft, used to treat high cholesterol, arthritis, and depression, respectively.

Plaintiffs' main contentions are that the lower prices offered by manufacturers violate the Robinson-Patman Act by harming their ability to compete, and that favored purchasers violated the Act by using their drug formularies to extract the lower prices.[2] Plaintiffs sought to prove that the

_____

[2] A drug formulary specifies which medications are approved for reimbursement.

discounts caused them to lose customers to the favored purchasers, and that as a consequence they suffered injury under the antitrust laws. Defendants contended that the plaintiffs could prove neither the competitive injury required to establish a *prima facie* claim under the Robinson-Patman Act, nor the antitrust injury required to recover damages. Following discovery that lasted many years, the defendants moved for summary judgment. The district court concluded that plaintiffs could prove neither type of injury and granted defendants summary judgment. *See Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*, No. 93-CV-5148 (ILG) (SMG), 2012 WL 3544771 (E.D.N.Y. Aug. 16, 2012). This appeal followed.

This case has a complicated history. Plaintiffs opted out of a class action filed against drug manufacturers in the early 1990s that was part of a multi-district litigation consolidated in the Northern District of Illinois. The class action alleged Sherman Act violations on the part of the manufacturers due to a two-tier pricing system. These claims ultimately failed. *In re Brand Name Prescription Drugs Antitrust Litigation*, Nos. 94-CV-897, 94-MDL-997 (CPK), 1999 WL 33889 (N.D. Ill. Jan. 19, 1999), *aff'd in part & vacated in part*, 186 F.3d 781 (7th Cir. 1999). The opt-out plaintiffs' cases were remanded. Those filed in the Eastern District of New York were consolidated and assigned to Judge I. Leo Glasser. Plaintiffs settled their Sherman Act claims, but litigated their Robinson-Patman Act claims before Judge Glasser and Magistrate Judge Steven M. Gold.

In those proceedings, certain plaintiffs and certain defendants were designated to move forward with discovery, and the designated defendants sought summary judgment. The district court denied summary judgment on the designated plaintiffs' Section 2(a) and 2(d) liability claims, of which competitive injury was an element. *Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*, 472 F. Supp. 2d 385, 406, 420 (E.D.N.Y. 2007) *amended by* No. 93-CV-5148 (ILG), 2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007). However, it granted summary judgment on claims for damages and injunctive relief because the designated plaintiffs failed to show that they, individually, suffered antitrust injury. *Id.* at 430-32; *Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*, No. 93-CV-5148 (ILG), 2007 WL

4526618 (E.D.N.Y. Dec. 20, 2007). After these judgments, 3,700 non-designated plaintiff pharmacies at 3,987 locations remained.[3] *Drug Mart Pharmacy Corp.*, 2012 WL 3544771, at *1 n.2. Of the plaintiff locations, 3,101 concluded that they would not be able to identify lost customers and filed stipulations of dismissal with prejudice. *Id.*

In an attempt to cure the fatal defect in the designated plaintiffs' case, these remaining plaintiffs devised, under court supervision, a matching process under which plaintiffs would attempt to identify customers they had lost to the favored purchasers. Thirty plaintiffs were randomly selected to participate in the matching process. After two additional plaintiffs dismissed their claims, there were twenty-eight remaining plaintiffs–who are the plaintiffs-appellants here. *Id.* at *4. Plaintiffs believed (and assured the court) that the matching process would yield a "material number" of lost customers. *Id.* The process went forward between March 2010 and May 2011, during which time plaintiffs obtained extensive discovery from five favored purchasers: Caremark, LLC, Advance PCS, Express Scripts, Medco, and Omnicare. *Id.* at *4-5. This process was pivotal to the resolution of the litigation because if plaintiffs could not show they lost customers to the favored purchasers during the years the rebates were in place, then they would be hard pressed to show competitive injury or damages.

The process was overseen by Magistrate Judge Gold and carefully designed and supervised to produce reliable matches. The parties focused their efforts on patients purchasing drugs used for chronic conditions, a population likely to continue to need the same or substantially similar drugs. The twenty-eight plaintiffs identified customers they had lost from among this group. They compared their databases of lost customers with the five favored purchasers' customer lists over a period from 1998 to 2010. Under this system, a "matched customer" was one who filled a prescription for one of the specified drugs, or a common substitute, at one of the five favored purchasers' pharmacies within six months of the last time they filled that prescription at one of the twenty-eight

---

[3] Several of the plaintiff pharmacies had more than one location.

plaintiff pharmacies. *Drug Mart*, 2012 WL 3544771, at *5. At the conclusion of the matching process, the parties stipulated that it had been used to "determine the universe of potential lost customers that Plaintiffs claim they lost as a result of the pricing practices of Defendants." *Id.* at *7.[4] In contrast to what plaintiffs had anticipated, the matching process showed exceedingly few lost customers.

Based on the results of the matching process, defendants moved for summary judgment against the twenty-eight matching process plaintiffs, which the district court granted on all claims.[5] Critical to this conclusion was the fact that the elaborate matching process showed that the plaintiffs had lost a minuscule number of customers to favored purchasers. As the district court noted, only approximately three percent of potential lost customers in plaintiffs' records could be identified as a customer who later filled his or her prescription with a favored purchaser. *Id.* at *5. National Community Pharmacists Association data showed that independent retail pharmacies filled between 22,000 and 28,000 prescriptions per year during the relevant time period. The district court contrasted these figures with the matching process data that showed an average of approximately eighteen lost customers and fifty-four lost transactions per pharmacy per year, a number of transactions that represented only one quarter of one percent of the average number of transactions of such pharmacies during that period. *Id.* at *6. It observed that many pharmacies lost no more than ten customers per defendant during the entire twelve-year period covered by the process. *Id.*

The district court noted plaintiffs' initial representations that they were "not proposing any kind of extrapolations," *id.* at *3, and that the results of the matching process represented the set of lost customers plaintiffs were claiming,

---

[4] Plaintiffs note that the stipulation also referred to "any other data Plaintiffs may seek to use" and argue that they remain able to rely on other evidence to prove their case. Joint App'x 314. In a conference shortly after the parties filed their stipulation, plaintiffs asked for additional discovery, which defendants opposed, and the court invited them to submit a motion with their request. Plaintiffs never did so. *Drug Mart Pharmacy Corp.*, 2012 WL 3544771, at *4.

[5] The parties agreed that the motion would be decided by Magistrate Judge Gold.

*id.* at *4. After the matching process was complete, and the results were less impressive than plaintiffs had expected, they sought to introduce additional data. *Drug Mart Pharmacy Corp.*, 2012 WL 3544771, at *5. Specifically, plaintiff Pharma-Card sought to introduce affidavits that it claimed showed additional lost customers. *Id.* at *5-7. The district court did not, as plaintiffs contend, ignore this evidence. On the contrary, the district court determined that including this data did not change its conclusion because Pharma-Card still demonstrated that it lost only about eighteen customers a year per location. *Id.* at *7. Without this additional data, the results were even more stark. When the district court examined the matching process data alone on a per-plaintiff basis, it found that no pharmacy lost more than around one percent of the total brand name prescription drug transactions conducted by the average independent pharmacy in a year. *Id.* at *6.

Relying on the results of this matching process, the district court concluded that plaintiffs had failed to come forth with evidence of competitive injury. *Id.* at *13-14. Although plaintiffs complained of a dramatic drop in sales, the district court concluded that their evidence suggested that only a very small percentage of each plaintiff's customers were lost to pharmacies that were alleged to have benefitted from the defendant manufacturers' discriminatory pricing. *Id.* at *8. The district court determined that plaintiffs' inability to show more than *de minimis* evidence of customers lost to favored purchasers meant that they failed to adduce sufficient evidence of competitive injury, a showing required for liability and damages for a Robinson-Patman Act claim. As a result, the district court granted summary judgment as to plaintiffs' Section 2(a) claims for declaratory relief and for damages. *Id.* at *12-15.

The district court also granted defendants' motion for summary judgment on plaintiffs' claim for injunctive relief. While acknowledging that injunctive relief under the Robinson-Patman Act does not necessarily require proof of past injury, the court concluded that failure to prove past injury over the significant period of time at issue weighed decisively against finding the probability of future injury required for an injunction. *Id.* at *15-16. Finally, the district court

held that plaintiffs' Section 2(d) and 2(f) claims also failed because liability under these sections requires establishing antitrust and competitive injury, respectively. *Id.* at *16. This appeal followed. For the reasons below, we affirm.[6]

## DISCUSSION

This Court reviews a district court's disposition of a motion for summary judgment *de novo*, treating all facts in the light most favorable to the non-moving party. *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). We have noted that the summary judgment phase is particularly important in antitrust matters because of the high cost of antitrust litigation and its potential chilling effect on the market as a whole. *Capital Imaging Assocs., v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 541 (2d Cir. 1993). Additionally, the Supreme Court has cautioned against extending the Robinson-Patman Act beyond its original bounds lest our interpretations "give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation." *Automatic Canteen Co. of Am. v. FTC*, 346 U.S. 61, 63 (1953); *see also Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 181 (2006) (Robinson-Patman Act should be read "consistently with broader policies of the antitrust laws").

I.      Section 2(a) Claims

A.      Competitive Injury

Section 2(a) of the Robinson-Patman Act makes it unlawful "to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition . . . or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them[.]" 15 U.S.C. § 13(a). "Price discrimination" in this context means a difference in the price charged for the items of like grade and quality to two different buyers. *Best Brands Beverage, Inc.*

---

[6] Although the judgment below concerns only the twenty-eight plaintiffs who appeal here, the remaining plaintiffs have stipulated that they will be bound by this court's determination. If the district court's judgment is affirmed and any further appeal fails, they will dismiss their claims with prejudice.

*v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 (2d Cir. 1987).

The type of competitive injury that appellants assert is "secondary line injury," which is an injury to competition between different purchasers of the same product. *Volvo*, 546 U.S. at 176; *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 219 (2d Cir. 2004). To establish secondary line injury through price discrimination, a plaintiff must show "(1) that [the] seller's sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 141 (2d Cir. 1998); *see also Volvo*, 546 U.S. at 176.

Since defendants freely admit that they sold the same brand name drugs interstate and to different buyers at different prices, the dispositive issue is whether doing so had a prohibited effect on competition. Plaintiffs attempting to establish competitive injury generally have two routes available to them: showing substantial discounts to a competitor over a significant period of time, known as the *Morton Salt* inference, or proof of sales lost to favored purchasers. *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435 (1983); *see also FTC v. Morton Salt Co.*, 334 U.S. 37, 50-51 (1948) (violation inferred from substantial price discrimination between competitors). *See* pages 12-15, *infra*.

The Supreme Court has refined these principles over the course of several decades, including most recently in *Volvo Trucks North America v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006). In *Volvo*, the Court made clear that in a secondary-line Robinson-Patman case the "hallmark of the requisite competitive injury" is the diversion of sales from a disfavored purchaser to a favored purchaser. *Id.* at 177. The Court also made clear that any "price discrimination" must "affect substantially" competition between the favored purchaser and the plaintiff. *Id.* at 180; 15 U.S.C. § 13(a) (prohibiting price discrimination where the effect "may be substantially to lessen competition"). Plaintiffs argue that *Volvo*'s discussion of

substantiality with respect to "price discrimination" pertains only to the alleged difference in the prices charged to different purchasers. However, the Court's focus in this sentence and throughout the opinion is on the existence and degree of actual competition among different purchasers. *Volvo*, 546 U.S. at 177, 179-80; *see also id.* at 186 (Stevens, J., dissenting) (identifying competition as the main issue in the majority opinion). In particular, the Court inquired into the number of instances in which plaintiff and a favored purchaser competed head-to-head, and sought instances where sales had been diverted from the former to the latter. *Id.* at 179-80. The Court concluded that the small number of instances in which the plaintiff and a favored purchaser competed directly for customers could not support a finding of competitive injury. *Id.* at 180. It follows from *Volvo* that if the loss attributable to impaired competition is *de minimis*, then the challenged practice cannot be said to have had a "substantial" affect on competition.

Our review of the evidence before the district court convinces us that plaintiffs failed to raise a question of material fact as to whether they suffered competitive injury. The results of the matching process make clear that plaintiffs could not generate evidence tending to show that they lost more than a *de minimis* number of customers to the favored purchasers, indicating that competition was not substantially harmed or threatened by the price difference in question. *Id.*

Some plaintiffs were able to demonstrate that they occasionally lost customers to some favored purchasers. However, the matching process shows very few customers lost in this way, especially when the number of customers lost by a plaintiff pharmacy is considered as a percentage of total lost customers over the period covered by the matching process. Specifically, the evidence showed that only approximately three percent of lost customers could be confirmed as lost to the favored purchasers through the matching process. *Drug Mart*, 2012 WL 3544771, at *5. The participants in the matching process lost an average of approximately eighteen customers and fifty-four transactions per year. *Id.* at *6. This loss must be measured in the context of the tens of thousands of prescriptions that an independent retail pharmacy fills every year. *Id.* Pharma-

Card, which alleges the highest absolute number of lost transactions, claims it lost 2,586 customers over the relevant period—nearly half of the total customers that all plaintiffs claim their data shows were lost. *Id.* at *7. Pharma-Card had fourteen retail locations, and so its numbers translate into a loss of an average of 184 customers per location over ten years—or approximately eighteen per year. *Id.* Klein's Pharmacy, the plaintiff with the highest number of lost transactions identified by the matching process as lost to favored purchasers, lost slightly more than one percent of brand name prescription drug transactions per year. *Id.* at *6. Even assuming that plaintiffs lost the ability to fill several prescriptions for each customer lost, this loss of customers is *de minimis* and therefore insufficient to demonstrate competitive injury.

Our conclusion that *de minimis* evidence of lost sales is insufficient to establish competitive injury is consistent not only with *Volvo*, but also with the approach of other circuits. *See, e.g.*, *Volvo*, 546 U.S. at 180 (diversion of sale of twelve trucks found insubstantial); *Boise Cascade Corp. v. FTC*, 837 F.2d 1127, 1135-37, 1145 (D.C. Cir. 1988) (reasons for small number of lost customers varied, suggesting no competitive injury); *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 580 (5th Cir. 1982) ("[A] plaintiff must demonstrate that the likely effect of the alleged price discrimination was to allow a favored competitor to draw *significant* sales or profits away from him[.]"(emphasis added)); *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1171 (7th Cir. 1978) (granting summary judgment on a Section 2(a) claim because the plaintiff failed to allege lost sales were more than *de minimis*).[7]

Plaintiffs do not seriously dispute that the number of diverted sales and customers was *de minimis*, but they contend that they are entitled to an inference of competitive injury under the *Morton Salt* doctrine. In *Morton Salt*, the defendant manufacturer sold several types of table salt directly to large retailers as well as to wholesalers, who then resold the salt to small retailers. *Morton Salt*,

---

[7] One of our sister circuits does not agree. *See, e.g.*, *Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 214-16 (3d Cir. 2007) (small number of lost customers still sufficient for plaintiff's claims to survive summary judgment when combined with other evidence).

334 U.S. at 40-41. The company instituted a quantity discount program that benefitted five large chains. Although theoretically the discounts were available to all, they were functionally unavailable to the small retailers and wholesalers because other companies and even wholesalers could not match the volume of sales to the largest purchasers. *Id.* at 42. Under the circumstances, the Supreme Court stated that evidence of individual lost sales was not necessary to show competitive injury. A reasonable possibility of harm to smaller retailers, the Court believed, was "obvious" and "self-evident," because small retailers were constrained to sell the same brand of the same commodity at higher prices than certain large chains. *Id.* at 46-47, 50. Thirty-five years later, the Supreme Court restated this inference, affirming that a reasonable possibility of competitive injury may be inferred from "a substantial price difference . . . over a significant period of time." *Falls City*, 460 U.S. at 437; *see Volvo*, 464 U.S. at 177 ("a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time"); *George Haug*, 148 F.3d at 142 ("*Morton Salt* permits an inference of injury to competition from evidence of a substantial price difference over time, because such a price difference may harm the competitive opportunities of purchasers, and thus create a 'reasonable possibility' that competition itself may be harmed."). It is well established, however, that the *Morton Salt* inference is simply an inference and may be rebutted. Specifically, the inference may be rebutted by evidence that favored purchasers were diverting only a *de minimis* number of customers.

Plaintiffs contend that the *Morton Salt* inference should be regarded as irrebuttable where, as here, the preferred purchasers have received substantial discounts over a considerable period and plaintiffs offer some evidence of diverted sales. In support of this proposition, they rely on a dictum in *Falls City* that "in the absence of direct evidence of displaced sales, the [*Morton Salt*] inference may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits." 460 U.S. at 437. According to plaintiffs, *Falls City* provides that where direct (even *de minimis*) evidence of

displaced sales exists, the *Morton Salt* inference may not be rebutted even by evidence breaking the causal connection between price discrimination and losses. At minimum, they claim, *Falls City* entitles them to trial on their claims for a declaratory judgment under Section 2(a).

This assertion rests on a misreading of *Falls City*. First, the conclusion that *de minimis* losses are insufficient to establish competitive injury follows from the text of the Robinson-Patman Act itself, not from the case law. As we have seen, Section 2(a) provides that price discrimination is illegal "where the effect of such discrimination may be substantially to lessen competition." 15 U.S.C. § 13(a). The Act itself thus requires at least the potential for substantial harm to competition. Additionally, the relevant language in *Falls City* simply does not stand for the proposition that if the *Morton Salt* inference is accompanied by evidence of displaced sales–regardless of the substantiality of that evidence–the inference becomes irrebuttable, and competitive injury is thus conclusively proven. Under plaintiffs' theory, even a single lost sale would bolt the inference in place–an outcome that cannot be squared with the Act's substantiality requirement. Moreover, we do not believe the *Morton Salt* inference may ever be completely irrebuttable because, after all, the ultimate question is whether there has been an injury to competition. Finally, *Falls City* does not indicate that in the absence of evidence of substantial diverted sales, defendants may *only* rebut the *Morton Salt* inference by breaking the causal connection between a price differential and lost sales.

When confronted with a similar situation, the D.C. Circuit has held that "if the respondent's evidence demonstrates that there is no competitive injury (or reasonable possibility of competitive injury) to begin with . . . [t]here is, under those circumstances, no causal connection to break." *Boise Cascade*, 837 F.2d at 1144. We agree with this logic. To accept plaintiffs' minimal evidence of displaced sales as creating an irrebuttable presumption of competitive injury makes little sense because it introduces theoretical rigidity into an area of law that aims to respond to economic reality. *See id.* at 1146 ("Robinson-Patman has not ushered in a bizarre rule of law that exalts theory 'no matter what' in the face

of hard, cold facts."). As the D.C. Circuit has noted, a fact intensive inquiry into competition "is dictated by the statute itself, which . . . calls for an inquiry into whether the effect of a price discrimination has been or 'may be substantially to lessen . . . injure, destroy or prevent competition.'" *Id.* at 1130 (citing 15 U.S.C. § 13(a)). Finally, an irrebuttable presumption would permit the protection of competitors to trump consideration of competition generally, which the Supreme Court has expressly counseled against*, see Volvo*, 546 U.S. at 181 ("we would resist interpretation geared more to the protection of existing *competitors* than to the stimulation of *competition*"), and may conceivably limit a court's ability "to construe the Act consistently with broader policies of the antitrust laws," *id.* (internal quotation omitted).

This is an unusual case. The plaintiffs have undertaken extensive discovery in an attempt to prove that sales were diverted from themselves to favored purchasers, a showing which the Supreme Court has identified as "[a] hallmark" of competitive injury. That discovery has come up well short of its mark. The *de minimis* results of the matching process show "an absence of competitive injury within the meaning of the Robinson-Patman Act," *id.* at 1144, and are sufficient to rebut a contrary inference created by *Morton Salt*.

Finally, plaintiffs claim that the district court relied entirely on the matching process in reaching its decision, improperly excluding other evidence from consideration. After the results of the matching process showed practically no lost sales to favored purchasers and with summary judgment looming, plaintiffs shifted gears and requested that the district court consider new evidence in addition to that generated by the matching process. *Drug Mart*, 2012 WL 3544771, at *4-5. In their summary judgment submissions, plaintiffs sought to include non-specific evidence of damages and affidavits claiming additional lost customers from Pharma-Card. *Id.* at *7. The district court did not mechanically reject any evidence outside the matching process. It noted plaintiffs' earlier representations that they would rely on the matching process, but nonetheless considered the additions that plaintiffs wanted to make, including Pharma-Card's evidence. *Id.* at *3-4, 7. The district court ultimately decided that this

additional evidence was insufficient to create a genuine factual dispute as to competitive injury or damages. *Id.* at *7. The Pharma-Card evidence, for instance, accounted for nearly half of the total amount of lost customers alleged by plaintiffs. *Id.* Even with this evidence included, Pharma-Card's per-store loss of customers remained small. *Id.* The court also found that other affidavits concerning lost customers were not sufficiently probative. *Id.* We are satisfied that the district court fully considered the relevant evidence. Given that an extended discovery process resulted in almost no evidence of diverted sales or other indicia of potential competitive injury, summary judgment was appropriate. *See PepsiCo. Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (reaffirming that "the burden on the moving party may be discharged by showing–that is pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case") (quotations omitted).

### B.      Antitrust Injury

In addition to declaratory relief, plaintiffs sought damages. To recover damages, plaintiffs must overcome an additional hurdle: they must show injury to competition, which consists of both competitive injury and antitrust injury. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).[8] Competitive injury and antitrust injury under the Clayton Act are distinct concepts. Competitive injury involves injury to competition through defendant's actions. Antitrust injury involves competitive injury to the plaintiff that resulted in specific losses. *Brunswick Corp.*, 429 U.S. at 489. Proving that a plaintiff has suffered antitrust injury requires "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *Blue Tree Hotels*, 369 F.3d at 220 (citing *Brunswick Corp.*, 429 U.S. at 489).

As discussed above, plaintiffs failed to raise a genuine issue of material fact as to competitive injury. It follows that they also fail to raise a question of

---

[8] The Robinson-Patman Act contains no damages provision, but plaintiffs have a private right of action under the Robinson-Patman Act through Section 4 of the Clayton Act, which provides for recovery of treble damages. 15 U.S.C. § 15.

material fact with respect to whether their injuries are the type of injury contemplated by the Robinson-Patman Act, as required to prove antitrust injury. *See Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 572 (1990) ("[A] plaintiff may not recover damages merely by showing a violation of the Act; rather, the plaintiff must also make some showing of actual injury attributable to something the antitrust laws were designed to prevent.") (quotation marks omitted). The *de minimis* loss of sales, as well as of customers, to the favored purchasers is a powerful indication that price discrimination did not harm competition. *See J. Truett Payne*, 451 U.S. at 561-62; *H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1022 (2d Cir. 1989) (holding that plaintiff failed to demonstrate sufficient antitrust injury because it could not connect its losses to behavior violating the Robinson-Patman Act); *Interstate Cigar Co. v. Sterling Drug Inc.*, 655 F.2d 29, 31 (2d Cir. 1981) ("[P]laintiffs failed to introduce substantial evidence showing that they were actually injured" by the alleged antitrust violation).

## C. Injunctive Relief

Plaintiffs also challenge the district court's determination that they are not entitled to injunctive relief under Section 16 of the Clayton Act. 15 U.S.C. § 26. Under that provision, injunctive relief is available to plaintiffs who "show a threat of antitrust injury" that, if it occurred, would be an injury under Section 4 of the Clayton Act. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 122 (1986). Although the issue was not explicitly raised in the parties' motion papers, the district court granted summary judgment for defendants on plaintiffs' claim for injunctive relief because it concluded that if "the allegedly anticompetitive conduct has been ongoing for a substantial period of time,"plaintiffs' inability to show past antitrust injury creates a presumption that they cannot establish future injury. *Drug Mart*, 2012 WL 3544771, at *15 (citing *Drug Mart*, 2007 WL 45266618, at *13). The district court relied heavily on Judge Glasser's earlier decision, which held that injunctive relief was inappropriate because the representative plaintiffs' failure to prove antitrust injury over the long period of time during which they

allege they were damaged allowed the court to infer that they would not suffer antitrust injury in the future. *Drug Mart*, 2007 WL 45266618, at *13.

Typically, the inability to prove past damages does not compel a finding that the plaintiff faces no threat of antitrust injury in the future. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). However, in certain situations, the lack of past injury may indicate that future injury is improbable. Here, plaintiffs cannot show a reasonable probability of future injury because, although they have alleged injury to competition over an extended period of time, the allegations fail for lack of evidence. That failure militates strongly against injunctive relief. *See Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 255 n.2 (3d Cir. 1980) ("[A]lthough injunctive relief may be appropriate where damages are not, in the circumstances present here, the failure to prove the fact of injury is conclusive as to both forms of relief."); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 670 n.14 (D.C. Cir. 1977) ("[W]here the programs in question have been in existence long enough for their potential effects on dealers to manifest themselves, the difference in the two standards [for past and potential antitrust injury] is not so consequential."). Plaintiffs have offered no argument that future conditions will change in such a way as to make the injuries they claim to have suffered more pronounced than currently alleged. Thus, injunctive relief is inappropriate.

II.     Remaining Claims Under Sections 2(d) and 2(f)

Finally, plaintiffs appeal the grant of summary judgment on their claims under Sections 2(d) and 2(f) of the Robinson-Patman Act. Section 2(d) of the Robinson-Patman Act prohibits offering promotional allowances or services "unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." 15 U.S.C. § 13(d). Although Section 2(d) does not require plaintiffs to establish competitive injury, it does require them to establish antitrust injury. *Blue Tree Hotels*, 369 F.3d at 219-20. Section 2(f) makes favored purchasers liable for "knowingly . . . . induc[ing] or receiv[ing] a discrimination in price"

prohibited by the Act. 15 U.S.C. § 13(f). A buyer cannot be liable unless the seller of the goods is liable under another section of the Act. *Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 78-79 (1979).

Although the record contains evidence that the favored purchasers induced other defendants to offer them lower prices, there is insufficient evidence that doing so injured plaintiffs' ability to compete. Plaintiffs acknowledge that "the analyses for antitrust and competitive injury do not differ [from the Section 2(a) analysis] for these claims," except that Section 2(d) does not require proof of competitive injury. Pl. Br. at 56. Since plaintiffs failed to show competitive or antitrust injury with regard to their Section 2(a) claim, summary judgment is appropriate with respect to their claims under Sections 2(d) and 2(f) as well.

## CONCLUSION

For the reasons explained above, we **AFFIRM** the judgment of the district court.